**UNITED STATES of America, Appellee,**

v.

**Stanley Martin BIGELEISEN, Appellant.**

**No. 79–2056.**

United States Court of Appeals,
Eighth Circuit.

Submitted April 18, 1980.

Decided July 9, 1980.

---

**1.** The tax court recently reaffirmed the *Buttke* decision in *Estate of Kearns v. Commissioner,* 73 T.C. No. 96 (March 27, 1980).

Richard M. Gale, Miami, Fla., for appellant.

Douglas A. Kelley, Asst. U. S. Atty., Minneapolis, Minn., for appellee; Thomas K. Berg, U. S. Atty., Minneapolis, Minn., on brief.

Before McMILLIAN and ARNOLD, Circuit Judges, and WRIGHT,* District Judge.

* The Hon. Scott O. Wright, United States District Judge for the Western District of Missouri, sitting by designation.

ARNOLD, Circuit Judge.

Stanley Martin Bigeleisen was convicted by a jury on seven counts of distributing cocaine and one count of conspiracy. The District Court sentenced him to twelve years imprisonment on all counts (the sentences to run concurrently), a $20,000 fine, and a ten-year special parole term. Bigeleisen argues that reversal is required for three reasons: First, that the government permitted its key witness to testify falsely that he had no agreement with the government and expected nothing in return for his cooperation; second, that the government was allowed to argue, without evidentiary support, that another witness was under investigation by the Internal Revenue Service; and third, that there was insufficient evidence that the substances involved in three of the counts were cocaine. Because we agree with Bigeleisen on the first and second grounds, we reverse and remand for a new trial.

### I.

The key government witness against Bigeleisen was John Paul Moore. Moore testified that he made several trips to Minnesota to deliver cocaine for Bigeleisen. During his own trial for these offenses, Moore changed his plea to guilty, and as a result of plea bargaining with the government, was sentenced to a prison term of three years. For some time he refused to implicate Bigeleisen. Moore testified that while he was in prison Bigeleisen agreed to give him $500 a month until Moore's wife could find work. Bigeleisen made one such payment, but when he failed to make another, Moore telephoned an Assistant United States Attorney and offered to cooperate. As a result of Moore's cooperation, Bigeleisen was indicted and brought to trial.

In return for Moore's cooperation, the government agreed to make his cooperation known to the sentencing judge and to the United States Parole Commission. The Assistant United States Attorney who represented the government before the Grand Jury and at Bigeleisen's trial, explained the agreement to the Grand Jury as follows:

Moore's deal with me was Moore called from North Dakota after he was put in jail and asked for help with the parole board and I said I would write a letter to the Judge for him or to the parole commission, whichever was the appropriate authority, if he cooperated with us and then I would, "make his cooperation known to the authorities." So, that's when Moore decided to cooperate and that was after he had been in jail for some time before he called up and said I would like to cooperate and what can you do for me.

\* \* \* \* \* \*

We could never put the cocaine from Bigeleisen's hands to Moore's hands [without Moore's cooperation] because we didn't know what happened in Florida. He is in jail on a three year sentence and it was, as I told you before, Moore who called us and offered to cooperate if I would make his cooperation known to both the sentencing judge for the purposes of reduction of sentence and also to the parole commission.

Now, no specific dates were given. I didn't say to Moore I'm going to, you have one year and I will get the judge to reduce your sentence. The deal was his cooperation would be made known.

During the government's opening statement at the Bigeleisen trial, the following brief comment about the agreement was made:

John Moore refused to testify for the government until he got in jail in Florida. He called me and offered to testify sometime in June. He agreed to testify and the government would make known to the sentencing judge at the time whatever his cooperation is.

During the government's direct examination of Moore, however, Moore explained his reasons for testifying and denied that he was to receive anything in return for his cooperation:

Q. Mr. Moore, why did you call me?
A. I called you to let you know that I decided to cooperate with the government on this matter.

Q. Why did you decide to cooperate with the government?

A. Well, Mr. Bigeleisen had agreed to help my family out some and he didn't fulfill his agreement.

Q. Could you tell us, when you say he agreed to help your family out, during what time period are we talking about?

A. Well, when I first was incarcerated down in Miami he come to visit me and I told him that I would need $500 a month for two or three months until my wife got to where she could work and handle my bills, and he said it would be no problem.

Q. Did he ever make such a payment to you?

A. Yes, he made one.

Q. In what amount?

A. $500.

Q. Did he ever make another payment to you?

A. No, he did not.

Q. Did you have a conversation with him concerning the payment?

A. Yes, I did.

Q. When did this conversation take place?

A. Around the first part of June.

Q. How was it, telephone or person?

A. I called him and asked him if he had made the payment and he said, no, he didn't have the money right then, that he would make it in two or three days. I called him back again and he still didn't make the payment. So that's when I decided to cooperate with the government.

Q. *Now, do you have an agreement with the government concerning your cooperation at this time?*

A. *No, I do not.*

Q. *By that I mean, is there anything that you are supposed to get in relation to testifying?*

A. *No, there is not.* (Emphasis added.)

The government did nothing to correct Moore's false testimony, and he was not questioned about the existence of an agreement during cross-examination. During closing argument to the jury, moreover, the government made no effort to set the record straight. Instead, only a portion of the circumstances surrounding Moore's decision to cooperate was mentioned:

. . . Moore . . . said Bigeleisen was going to pay him the $500 per month to take care of his family. I suggest that is silence money paid by Bigeleisen to keep Moore's mouth shut because Moore had not agreed to cooperate with the Government at all up until this particular time. That was the worst $500 that Stanley Bigeleisen didn't spend because that is what opened Moore's mouth when he stopped the payments and Moore called me and said he decided to cooperate.

*        *        *        *        *        *

Agent Fossum and I are not ashamed of the plea bargains in this case. In every instance the Judge sentenced them for less than they were involved. You will recall that Eskandary, Gibbons and Munns, all had to agree to testify for the government.

At the time that Moore pled, his plea bargain didn't have anything to do with his testimony. That was Mr. Kogen's [Bigeleisen's trial lawyer] testimony. Moore at the time he pled did not have to testify.

Bigeleisen argues that he was denied a fair trial when the government failed to correct Moore's false testimony and then capitalized on it during closing argument. In these circumstances, has Bigeleisen been denied due process of law?

■ Our inquiry begins with *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The principal state witness in a murder prosecution, serving a 199-year sentence for the same murder, testified that he had received no promise of consideration in return for his testimony. In fact, he had been promised consideration, but the prosecutor did nothing to correct the testimony. The Supreme Court characterized the issue as whether "the failure of the prosecutor to correct the testimony of

the witness which he knew to be false denied petitioner due process . . . ." *Id.* at 265, 79 S.Ct. at 1175. In setting aside the conviction, the Court reasoned that a conviction obtained through false evidence must fall under the Fourteenth Amendment "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. . . ." *Id.* at 269, 79 S.Ct. at 1177. It does not matter that the false testimony goes only to the witness's credibility. Concerning the jury's credibility determinations, the Court said:

> The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence and it is upon such subtle factors as the possible interest of a witness in testifying falsely that a defendant's life or liberty may depend.

*Ibid.* The State argued further that since the jury was told of other grounds for believing that the witness might have an interest in testifying against the defendant, no prejudice occurred. The Court disagreed and said that this did not turn what was "a tainted trial into a fair one." *Id.* at 270, 79 S.Ct. at 1177.

In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the prosecution's key witness falsely testified that he had received no promise in return for his cooperation. The government's trial attorney had no knowledge of the promise that had been made. He did not correct the false testimony and in fact argued it in his summation. The Supreme Court reasoned that false testimony that goes uncorrected by the prosecution does not automatically require reversal, but a new trial is required if the "false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." *Id.* at 154, 92 S.Ct. at 766, (quoting *Napue, supra,* 360 U.S. at 271, 79 S.Ct. at 1178). The Court reversed and remanded for a new trial, saying:

> Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.

*Id.,* 405 U.S. at 154–55, 92 S.Ct. at 766.

In *United States v. Sanfilippo,* 564 F.2d 176 (5th Cir. 1977), the government had written to the defendant's lawyer prior to trial explaining the terms of its agreement with a key witness. On direct examination, the witness disclosed part of the agreement, but refused to disclose all of it on cross-examination. The government knew that the testimony was false, but did nothing to correct it. The Fifth Circuit pointed out that while the prosecutor had satisfied his duty under *Giglio* to disclose fully to the defendant the terms of the plea bargain with the witness, "[t]he defendant gains nothing . . . by knowing that the Government's witness has a personal interest in testifying unless he is able to impart that knowledge to the jury." *Id.* at 178. Was the government relieved of its responsibility to correct the false testimony since defense counsel could have sought to introduce into evidence the letter which explained the terms of the agreement, or could have subpoenaed the witness's lawyer to testify at trial, or could have asked the government to stipulate to the terms of the agreement? The Fifth Circuit said no.

> The cases hold that the duty to correct the false testimony of a Government witness is on the prosecutor. That duty arises "when [the false evidence] appears." *Napue v. Illinois,* 360 U.S. at 269, 79 S.Ct. at 1173.

564 F.2d at 178. The Court found it unnecessary, however, to reverse solely on the failure to perform that duty. Not only did the government fail to correct the false testimony, but it capitalized on it in closing argument, and the Court held that the combined prejudice warranted reversal. *Id.* at 179.

■ We now turn to the facts at bar. At trial, Bigeleisen's primary defense was that

the co-conspirators—Eskandary, Gibbons, Munns, and Moore, all of whom had pleaded guilty and had been sentenced—fabricated their testimony in order to "get" Bigeleisen, the government's primary target, and thereby curry favor with the prosecution in the hope of having their sentences reduced. It was important that the jury have knowledge of any interest a witness might have in testifying against Bigeleisen, and full knowledge of any agreements with the government was critical in assessing their credibility.

Moore was the government's key witness. He delivered the cocaine from Florida to Minnesota, and his testimony was critical to establish Bigeleisen as the source. The government was unwilling to seek an indictment against Bigeleisen without Moore's cooperation.

█ The government argues that since it disclosed the terms of the agreement during its opening statement to the jury, Moore's denial of an agreement was inconsequential. We cannot agree. For one thing, the whole agreement was not disclosed. The government did not mention its undertaking to intercede with the Parole Commission, and that body will often be able to do an inmate more good than a sentencing judge. In addition, an opening statement is not evidence. On the stand, Moore denied that an agreement existed, and the government failed to correct his testimony. The duty to correct false testimony is on the prosecutor, and that duty arises when the false evidence appears. *Napue v. Illinois, supra,* 360 U.S. at 269, 79 S.Ct. at 1177; *United States v. Sanfilippo, supra,* at 178. Furthermore, the prosecutor capitalized on Moore's testimony during closing argument. The government attorney argued that Moore decided to testify

because Bigeleisen stopped giving him "silence money," and this is a permissible argument as far as it goes; in his rebuttal argument, however, the prosecutor dealt with credibility issues at length and pointed out that three other conspirators during plea bargaining had to agree to testify for the government. The government's silence about Moore, in context, implied that Moore made no agreement.

█ We are unable to conclude that the record provided the jury with the evidence necessary to evaluate Moore's credibility as a witness. We are mindful, however, that not every failure to disclose or misleading argument requires a new trial. Materiality is the key, and "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). We must evaluate the reasonable impact of the omitted evidence, and the government's misleading closing argument, on the jury verdict. *United States v. McClintic,* 570 F.2d 685, 692 (8th Cir. 1978). A new trial is required if the judgment of the jury could "in any reasonable likelihood have [been] affected . . . ." *Giglio, supra,* 405 U.S. at 154, 92 S.Ct. at 766; *Napue, supra,* 360 U.S. at 271, 79 S.Ct. at 1178. See *United States v. Runge,* 593 F.2d 66, 73 (8th Cir. 1979).

█ We have carefully reviewed the evidence which was presented to the jury. Although the case against Bigeleisen was strong, we are unable to say that there is no reasonable likelihood that the false testimony and the misleading closing argument could have affected the judgment of the jury.[1] As the Supreme Court said in *Na-*

1. The instant case is distinguishable from *United States v. Johnson,* 605 F.2d 1088 (8th Cir. 1979), in which we found that the witness's failure to disclose the full agreement with the government did not require reversal. After the defendant had presented his case, the Court disclosed the full agreement to the defendant. The defendant then sought permission to tell the jury most, but not all, the terms of the

agreement. The Court gave the defendant the option of disclosing the entire agreement or nothing. The defendant presented no further testimony and moved for a mistrial. In view of these facts, we found no prejudice to the defendant.

We also do not find *United States v. McClintic,* 570 F.2d 685 (8th Cir. 1978), controlling. In *McClintic,* two witnesses were involved. One

*pue,* the possible interest of a witness in testifying falsely may determine guilt or innocence. Here, Moore's testimony was the linchpin in the government's case, and the jury was entitled to know the extent of his interest in testifying falsely against Bigeleisen. Whether he had an agreement regarding his testimony was central to the jury's credibility evaluation. In view of Moore's testimony and the government's closing argument, the jury could reasonably have believed that no agreement existed. In these circumstances, the jury could not have properly evaluated Moore's credibility, and there is a reasonable likelihood that its verdict was thereby affected.[2]

We need not base our reversal solely on this ground, however. During its closing argument, in an effort to buttress Moore's credibility the government was allowed to argue without evidential support, and over objection, that the reason Eskandary's testimony about the amount of cocaine delivered to him differed from Moore's testimony was because Eskandary was under investigation by the Internal Revenue Service. The government argues that it is common knowledge that the I.R.S. requires income derived from illegal means to be reported, and that its statement during closing argument was a permissible inference which could be drawn from the evidence. Bigeleisen argues that there was no evidence that the I.R.S. was investigating Eskandary

and that the government's closing argument, in an effort to explain discrepancies between the testimony of Moore and Eskandary, was improper and prejudicial. It is to this argument which we now turn.

## II.

Mahmoud Eskandary was the person to whom Moore delivered the cocaine in Minnesota. Eskandary's testimony as to the amounts of cocaine delivered to him did not coincide with Moore's. Moore testified that on several occasions he delivered a kilo to Eskandary. Eskandary, on the other hand, testified that the only time he received as much as a kilo was on Moore's final trip to Minnesota.

In an effort to bolster Moore's credibility and explain away the differences between his testimony and that of Eskandary, the government attorney made the following argument during summation:

If we think about it, why would Eskandary be consistently lower than Moore in the amount of cocaine brought up here? There is not any real big secret. One of the motivations that somebody has is to make a lot of money and after they do that who is going to be around the door to come to them next. The I.R.S.? The I.R.S. is still looking at Eskandary and Eskandary is considering what he is going to do—

of them testified that the government had bound itself to probation with regard to him. The bargain actually made with both of them was that if the court did not acquiesce in probation all charges would be dismissed. We found that the failure to disclose the precise terms of the agreements could not, in any reasonable likelihood, have affected the judgment of the jury. It had been made clear to the jury that neither witness would suffer incarceration; we did not believe that the fact that their freedom would result from probation rather than dismissal would be so additionally persuasive on the issue of credibility that a new trial should result. Further, there was no claim that the prosecution exacerbated the situation by improper argument.

**2.** The government also argues that Bigeleisen's trial attorney, Max Kogen, had been advised by the government prior to trial of the terms under which Moore would testify, and made a tactical choice not to cross-examine Moore about the

agreement. Kogen does not represent Bigeleisen on appeal. There is nothing in the record, moreover, to indicate that Kogen was so informed. In the government's appellate brief, the Assistant U. S. Attorney states that he told Kogen of the terms of the agreement by telephone before trial. In Bigeleisen's appellate brief, his appellate attorney states that he has spoken with Kogen about this issue and that Kogen denies that he was so informed and is willing to testify to that effect. We are unable to resolve this factual dispute between counsel on the current record and find it unnecessary to do so. We hold that the combined effect of the government's failure to correct Moore's false testimony, the implication by the government during closing argument that Moore made no agreement, and the government's unsupported statements during closing argument about the I.R.S., was to deny Bigeleisen a fair trial.

MR. KOGEN: I object and move for a mistrial. There is no evidence that the I.R.S. is looking at Eskandary or anyone else.

THE COURT: I deny the motion.

MR. KELLEY: (Continuing) Eskandary will tell the truth, but if he can minimize his own involvement, he is minimizing how bad the Judge looks at him or whether the I.R.S. is going to stick him with a big amount after he serves the time he is going to serve. That is the best explanation for the discrepancies in these deals.

As Bigeleisen's trial counsel pointed out, there was no evidence in the record that the I.R.S. was investigating, or "looking at," Eskandary.

We are mindful that the trial court has broad discretion in controlling closing arguments. Still, in our view the comments in question were not reasonable inferences which could be drawn from evidence in the record. Bigeleisen's primary defense was that the co-conspirators had fabricated their testimony in order to "get" Bigeleisen, and discrepancies in their testimony were critical to the theory of the defense. The comments about the I.R.S. allowed the government to shore up Moore's testimony through the use of facts not in the record. In these circumstances, we believe that the comments were improper and that the jury should have been admonished to disregard the references to the I.R.S. in its deliberations. If the government had said that the I.R.S. *might* look at Eskandary, that would be one thing. What happened here was quite different. The government stated, as a fact, that the I.R.S. *was* looking at Eskandary, and there is no evidence in this record to sustain that statement.

### III.

We need not, and do not, hold that either of the first two allegations of prejudicial error asserted in this appeal, standing alone, would be sufficient to warrant reversal. We hold merely that their combined effect was prejudicial to Bigeleisen and denied him due process of law. The actions and omissions of the prosecutor, when considered in combination and in context, were "so offensive as to deprive the defendant of a fair trial." *Isaacs v. United States*, 301 F.2d 706, 736 (8th Cir.), *cert. denied*, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962).[3]

Reversed and remanded.

---

**3.** We do not reach Bigeleisen's third argument that he was entitled to judgment of acquittal on counts I, III, and IV.