**UNITED STATES of America, Appellee,**

v.

**Richard Lee FOSTER, Appellant.**

No. 87–5326.

United States Court of Appeals, Eighth Circuit.

Submitted May 13, 1988.

Decided Nov. 10, 1988.

Earl P. Gray, St. Paul, Minn., for appellant.

Joan Ericksen, Minneapolis, Minn., for appellee.

Before HEANEY and McMILLIAN, Circuit Judges, and HILL,* Senior District Judge.

McMILLIAN, Circuit Judge.

Richard Lee Foster appeals from a judgment entered in the District Court for the District of Minnesota upon a jury verdict finding him guilty of conspiracy to commit physical violence in violation of 18 U.S.C. §§ 371, 1951, conspiracy to destroy property by arson in violation of 18 U.S.C. §§ 371, 844(i), solicitation to commit a felony in violation of 18 U.S.C. § 373, and unlawful possession of a destructive device in violation of 26 U.S.C. § 5861. For reversal, Foster argues that the prosecutor's misconduct deprived him of his due process right to a fair trial.[1] Because of the prejudicial prosecutorial misconduct at Foster's trial, we reverse and remand for a new trial.

---

* The Honorable Irving Hill, Senior United States District Judge for the Central District of California, sitting by special designation.

1. Foster also presses several other arguments for reversal which we need not address in view of our disposition of his prosecutorial misconduct argument.

I

This case began as a dispute between two bar owners in Rochester, Minnesota. On June 6, 1984, Foster purchased the "Pub Bar" from Harold Hayes. As part of the purchase agreement, Hayes agreed to work at the Pub Bar for six months to train Foster and help him manage the business. Hayes continued to work at the bar until February of 1985, but when he acquired an option to buy a competing bar, Foster discharged him. Hayes purchased the "63 Club" bar in Rochester on April 17, 1985. Hayes testified that Foster was angry with him about the purchase of the 63 Club bar because Foster had believed that they had an understanding not to compete.

Meanwhile, in Gatlinburg, Tennessee, the aptly named Richard Savage had placed an ad in *Soldier of Fortune* magazine which read: "GUN FOR HIRE: 37 year old professional mercenary desires jobs. Vietnam Veteran. Discrete and very private. Bodyguard, courier, and other special skills. All jobs considered." Savage lived in Gatlinburg with his girlfriend, Deborah Mattingly. Mattingly testified that she received a telephone call for Savage in early June of 1985 from a person whose voice she later came to know as Foster's. Shortly thereafter, Savage, his associate William Buckley, Mattingly, and a woman named Linda Smith traveled to Rochester, Minnesota. The Savage group arrived in Rochester on June 3rd, and met with Foster that evening. Buckley testified that Foster desired to put Hayes [2] out of business and requested Savage and Buckley to mug Hayes in a way as to appear like a random robbery and to break his legs. Foster was to pay Savage and Buckley with an electronic "bug" detector and a number of hand grenades. Savage, Buckley, and Foster then drove over to the 63 Club and surveyed the area where the mugging was to occur.

Savage and Buckley had brought a stun gun and brass knuckles with them from Gatlinburg, but they decided that these would be insufficient for the task and purchased an ax handle and wrapped it with tape. On the evening of June 5th, Savage and Buckley hid in a wooded area near the 63 Club. They abandoned their planned attack, however, because customers were outside the bar when Hayes came out. Buckley testified that he later observed Savage in possession of an electronic "bug" detector and six hand grenades which he believed had come from Foster. After the failed attempt to mug Hayes on June 5th, Savage and Buckley decided not to try again and returned with Mattingly and Smith to the home of Savage's mother, Muriel Savage, in Knoxville, Tennessee.

Telephone records introduced at trial showed that phone calls were placed from Muriel Savage's home to Foster's home on June 9, 16, and 19. Buckley testified that in late June or early July of 1985 he and Savage returned to Rochester for the purpose of blowing up a building. Upon arriving in town, Savage and Buckley met with Foster at the Pub Bar. Buckley testified that Foster then described the building to be blown up as the supply house of a poultry company owned by William Keough, Jr., who was in the business of supplying exotic bird feathers. The supply house was located in Fertile, Iowa.[3] Buckley said that Foster wished to cause Keough to go out of business, and Buckley sensed that the reason for the bombing was drug-related. Keough testified that Foster had a motive to bomb his supply house because Keough owed Foster $3,000.00 due to prior cocaine dealings. Buckley testified that Foster agreed to pay them $1,500.00 for the bombing.

After Buckley assembled materials for a bomb, he and Savage again met with Foster. This time Foster brought a man named John Jimenez [4] with him, who was

---

2. Buckley did not mention Hayes by name, however, until it was suggested to him in a question posed by the prosecutor.

3. Buckley did not mention the location of the supply house, however, until it was suggested to him by a question posed by the prosecutor.

4. Buckley, however, was able to identify this man only by his first name, "John," until the prosecutor identified "John" as John Jimenez in a question.

to travel to Iowa with Savage and Buckley and point out the building to be destroyed. That evening Jimenez drove Savage and Buckley to Keough's poultry farm, where Savage and Buckley placed the bomb with a forty minute timer. The three men then returned to Rochester where they met Foster at approximately 4:00 a.m. The bomb exploded on schedule and destroyed most of the supply house.

The following evening Savage and Buckley returned to the 63 Club to complete their earlier contract to mug Hayes. They called off the attack, however, when Hayes emerged from the club bearing a pistol and accompanied by a person with a shotgun. As Savage and Buckley left the area near Hayes' bar, they were stopped and questioned by a Rochester policeman. After being questioned, Savage and Buckley immediately returned to Knoxville.

After several telephone calls between Savage and Foster, Savage returned to Rochester on August 10, 1985, with Buckley and a man named Michael Jackson. Savage had met Jackson after seeing his ad in *Soldier of Fortune* magazine. Buckley had met Jackson when they worked on a job for Savage in Marietta, Georgia, in which they bombed a car with two hand grenades. Buckley testified that they returned to Rochester the third time for the purpose of bombing the 63 Club for Foster.

Upon arriving in Rochester, Buckley purchased the material necessary for constructing a bomb. During the assembly of the bomb in the three men's motel room, Foster arrived and gave Savage an Uzi machine gun and two magazines. Jackson testified that Savage told Foster that Jackson would serve as Foster's bodyguard to protect him from reprisals by Hayes. Foster then left the motel, and Savage, Buckley and Jackson went to the 63 Club and placed the bomb there after the club had closed.

Savage and Buckley traveled to Louisville, Kentucky, that night, while Jackson remained in Rochester with Foster. Later that evening Foster and Jackson went to the 63 Club and learned that the bomb had not gone off. After Foster spoke with Savage over the telephone, Foster and Jackson decided to retrieve the bomb. Foster contacted Jimenez, who drove Jackson over to the 63 Club where Jackson retrieved the bomb.

The following day, August 11, 1985, Jackson purchased materials to reconstruct the bomb, which he and Jimenez placed at the 63 Club that evening. The two men watched to see if the bomb exploded, but it only partially detonated, cracking the glass door to the Club. The two men then retrieved the remains of the bomb. Not to be discouraged, the would-be arsonists constructed a third bomb the following day, August 12, 1985. That evening Jackson placed the bomb in a garage located under the 63 Club. The following morning Jimenez reported that the bomb had not detonated, and Jackson returned to Tennessee. This bomb was discovered by the Rochester police that afternoon.

On December 16, 1986, Foster was charged in an eight count indictment along with Savage and Jimenez. Foster was tried individually beginning on April 6, 1987, and on May 1, 1987, the jury returned a verdict finding Foster guilty on all seven counts of the indictment in which Foster was charged. The district court sentenced Foster to incarceration for twelve years and this appeal followed.

## II

Foster raises five varieties of prosecutorial misconduct: (1) the knowing use of false testimony, (2) the misrepresentation of witness immunity, (3) improperly suggestive questioning, (4) improper remarks in closing argument, and (5) the failure to turn over to the defense material exculpatory evidence. We need only consider the first two of these points because we are convinced that they by themselves require a new trial.

The critical evidence for the government at Foster's trial was the testimony of his co-conspirators, Buckley, Jackson, and Mattingly. The defense evidence centered on Foster's own testimony, which flatly denied much of the testimony of the government

witnesses. The case boiled down to a question of the credibility of the witnesses.

In exchange for their cooperation, Mattingly, Buckley, and Jackson were all granted various forms of immunity. On April 8, 1986, the government agreed that "[i]n exchange for Mr. Jackson's cooperation, he will not be prosecuted in the District of Minnesota for his part in the crimes committed by Richard Foster." By letter dated January 16, 1987, the government promised that "Debra Mattingly will not be prosecuted in this district for her role, such as it was, in assisting Savage, Foster, and Jimenez in the arson, attempted arson, and conspiracy charged in the attached indictment." Finally, on March 30, 1987, the government agreed that "[t]he District of Minnesota will not use Mr. Buckley's statements against him. He understands that if he is prosecuted here, the statements he made to [investigatory] ag nt[s] in connection with his cooperation would not be used against him." This type of agreement is commonly referred to as "use" immunity.

On direct examination, the prosecutor asked Mattingly: "Have any promises been made to you as far as whether you may or may not be prosecuted in the State of Minnesota"? Mattingly responded: "Not to my knowledge." The prosecutor made no attempt to refresh Mattingly's recollection that in fact she had been promised that she would not be prosecuted in Minnesota in exchange for her cooperation. The prosecutor did, however, ask Mattingly: "Do you believe that you will be prosecuted in the State of Minnesota"? Mattingly responded: "No." The prosecutor similarly asked Buckley on direct examination whether any promises had been made to him about whether or not he would be prosecuted as a result of his activity in Minnesota. Buckley responded: "There have been no promises at all." The prosecutor made no attempt to refresh Buckley's recollection that he had been promised use immunity in exchange for his cooperation. The promise not to prosecute Jackson in Minnesota in return for his cooperation was fully elicited.

Foster argues that the failure of the prosecutor to correct Mattingly and Buckley's false and misleading testimony regarding their agreements with the government amounted to the knowing use of false testimony by the prosecutor and violated his due process right to a fair trial. Our analysis of this argument must begin with *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In that case, the principal government witness testified in response to a question by the prosecutor that he had received no consideration in return for his testimony. The prosecutor had in fact promised him consideration, but he did nothing to correct the witness' false testimony. In reversing the petitioner's conviction the Court stated that

[a] conviction obtained through use of false evidence, known to be such by the representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implied in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

*Id.* at 269, 79 S.Ct. at 1177 (citations omitted). The Court also rejected the State's argument that no prejudice occurred because the jury was told of other reasons to believe that the witness would have an interest in testifying against the defendant. The Court maintained that this did not "turn[ ] what was otherwise a tainted trial into a fair one." *Id.* at 270, 79 S.Ct. at 1177.

*Napue* was reaffirmed in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), where the govern-

ment's key witness testified falsely that he had received no promises in return for his cooperation. The prosecutor failed to correct this testimony and the Court reversed, reasoning that under these circumstances "[a] new trial is required if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury.'" *Id.* at 154, 92 S.Ct. at 766 (quoting *Napue*, 360 U.S. at 271, 79 S.Ct. at 1178).

We applied the *Napue/Giglio* rule in *United States v. Bigeleisen*, 625 F.2d 203 (8th Cir.1980). There, we reversed the defendant's conviction because the prosecutor failed to correct a witness' false testimony that he had not been promised consideration in return for his testimony. Moreover, in that case, the prosecutor had gone further and argued the fact that the witness had not been promised consideration to the jury during closing argument. We noted that

> [t]he duty to correct false testimony is on the prosecutor, and that duty arises when the false evidence appears.
>
> ....
>
> .... Although the case against Bigeleisen was strong, we are unable to say that there is no reasonable likelihood that the false testimony and the misleading closing argument could have affected the judgment of the jury.

*Id.* at 208 (citations and footnote omitted).

■ *Napue, Giglio,* and *Bigeleisen* are directly applicable here. Buckley and Mattingly testified that no promises had been made to them in exchange for their testimony. This was false, and the prosecutor breached her duty to correct the falsehoods.

Under *Giglio,* a new trial is required if the judgment of the jury could "in any reasonable likelihood have [been] affected." *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766. After reviewing the conflicting evidence presented to the jury in this case, we are unable to say that there was no reasonable likelihood that the false testimony could have affected the judgment of the jury. Buckley and Mattingly were critical witnesses in the government's case, and their testimony was directly contradicted by Fos-

ter. In a case resting essentially on the credibility of the witnesses, the failure to inform the jury of the promises made to the witnesses was prejudicial.

■ We need not, however, ground reversal solely on the basis of the prosecutor's failure to correct the witnesses' false testimony. Here, during its deliberations, the jury submitted a question to the district court asking whether Buckley, Jackson, and Mattingly had been granted immunity in return for their testimony. The district court asked the prosecutor what her position was with respect to answering the question. The prosecutor responded that the question should be answered by "saying no they have not been granted immunity." The district court so answered the question and the jury returned with a verdict of guilty.

In fact, Buckley, Mattingly, and Jackson had all been promised immunity to some extent. These promises were all reflected by letters in the prosecutor's file, and she is charged with the awareness of them. The fact that defense counsel was also aware of the letters but failed to correct the prosecutor's misrepresentation is of no consequence. This did not relieve the prosecutor of her overriding duty of candor to the court, and to seek justice rather than convictions.

In combination with the prosecutor's failure to correct the false testimony by Mattingly and Buckley with regard to immunity, it is difficult to imagine how a misrepresentation of fact by an attorney could have been more prejudicial. The case rested essentially on the credibility of the witnesses. The jury was clearly concerned about the possibility that *these three* witnesses might have had a motive to testify falsely; the jury specifically asked whether these three witnesses had been granted immunity. Under these circumstances, the prosecutor's misrepresentation to the court that these witnesses had not been granted immunity clearly warrants reversal.

Accordingly, the judgment of the district court is reversed, and the case is remanded for a new trial.

HILL, Senior District Judge, specially concurring:

I concur in the result but I cannot concur in certain portions of the Court's opinion. I agree with what the majority has said concerning the witness Mattingly. The prosecutor had an obligation to correct the witness's false testimony as to the promises made to her. The breach of that duty was, by itself, serious enough to require reversal.

I am unable to concur in the majority's view of the witness Buckley. As I read the record, his testimony was not false. He was asked whether any promises had been made to him about whether or not he would be *prosecuted* as a result of his activity in Minnesota. His response, that there had been no such promises at all, was truthful. A different and far lesser promise had been made to him. The only promise made to him was one concerning the use against him in Minnesota of the testimony he would give in the instant trial. Under the circumstances, especially because the defense counsel had been fully informed about that promise, I cannot characterize Buckley's testimony as false. Nor can I agree that the prosecutor, under these facts, was required to bring out the understanding concerning use immunity.

I am also unable to agree with the majority's discussion of the events involved in answering the jury's question concerning immunity after deliberations commenced. In my view, the majority opinion mischaracterizes the record as to the matter. It is true that when the note came in from the jury, the court addressed a question to counsel (apparently both counsel) asking what counsel's position was with respect to how the question should be answered. The majority opinion asserts that the prosecutor responded by suggesting that the answer should say, "No, they have not been granted immunity". The prosecutor did so answer the court, but *only after* defense counsel had answered the court's question by categorically asking the court to inform the jury, "There is no immunity granted to them." In other words, defense counsel suggested the answer which the court eventually gave and the prosecutor concurred. I do not think this colloquy can fairly be characterized as a misrepresentation by the prosecutor. The answer the court gave to the question was suggested by defense counsel and concurred in by him. The prosecutor's concurrence in the answer suggested by defense counsel, should not, in my opinion be condemned. The trial judge apparently interpreted the question as an inquiry as to whether witnesses Buckley, Mattingly and Jackson had been formally and totally immunized as had witness Keough. It appears to me that the prosecutor and defense counsel similarly interpreted the question. On that basis, the court's negative answer was not a misrepresentation, but was a correct answer. It could have been made more complete by describing the other types of promises made to the three witnesses named. In hindsight it might have been better to make the answer entirely complete. But I cannot regard the prosecutor's concurrence in an answer suggested and agreed to by defense counsel as an act of misrepresentation or a violation of a prosecutor's "duty of candor".