# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-3736

_____

United States of America

*Plaintiff - Appellee*

v.

Samuel B. Ford

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: October 19, 2012
Filed: June 20, 2013

_____

Before LOKEN, SMITH, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury convicted Samuel Ford ("Ford") of knowingly and intentionally distributing a mixture of heroin to Joseph Scolaro resulting in Scolaro's death, with the distribution occurring within 1,000 feet of a school, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 851, and 860(a) ("Count I"), and knowingly and intentionally distributing a mixture containing heroin and a mixture containing

cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 851 ("Count II"). Ford moved for a new trial alleging that the prosecution committed a *Brady*[1] violation. The district court[2] denied Ford's motion. Ford appeals, raising three issues: (1) the evidence to sustain his conviction was insufficient; (2) the district court erroneously denied a motion for new trial based on the prosecution's alleged *Brady* violation; and (3) the district court erred by admitting evidence of Ford's prior convictions and bad acts. We affirm.

I. *Background*

Because the sufficiency of the evidence to sustain the convictions is at issue, a review of the evidence is in order. Cheryl Wells testified that Ford regularly sold her heroin in .25-gram quantities for $50.00 each in late 2010 and early 2011. On occasion, Wells purchased as much as $300.00 worth of heroin in a single day. Wells stated that she knew that Ford traveled to Chicago to obtain the drugs and would supply them to her when he returned. Wells also helped Ford package the heroin for resale in exchange for her keeping the residue wasted during the packaging process. Wells recalled delivering heroin to Lori Schneider on Ford's behalf. Schneider's nephew, Taylor Seeley, also testified that Ford sold him heroin several times during the month of February 2011.

Christi Worm ("Worm"), Scolaro's girlfriend, testified that Scolaro introduced her to Ford and obtained pills and heroin from Ford. The prosecution adduced evidence that on February 19, 2011, Ford provided Scolaro with heroin and that Scolaro died later that evening at Worm's residence. Worm testified that on the evening Scolaro died, she overheard Scolaro speaking on the phone with someone from whom Scolaro intended to purchase heroin. Scolaro asked Worm to drive him

---

[1]*Brady v. Maryland*, 373 U.S. 83 (1963).

[2]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

to meet this individual for a heroin pickup. She parked two blocks away from the rendezvous site. Worm believed they went to get the drugs about 11 to 11:30 p.m. Scolaro exited the vehicle and returned ten minutes later with heroin. Worm testified that the rendezvous site was a location from which Ford had sold her pills before.

Ford, on his own behalf, also testified that Scolaro came to his house on February 19th asking for drugs. Ford, however, stated that he refused to provide Scolaro with heroin. Ford acknowledged that he had gotten high on heroin with Scolaro two days before Scolaro died. Officers found heroin in Ford's coat pocket when they arrested him. During a search of Ford's apartment the same day, police found marijuana, drug paraphernalia, and plastic baggies that tested positive for cocaine residue. In a police interview, Ford admitted selling marijuana but denied selling other drugs.

According to Worm, after Scolaro purchased the drugs, he returned to the car, where Worm waited. When asked if she had ever previously seen Scolaro high on heroin, Worm described an incident "at Larry's" after which Scolaro came to her house and "had a needle stuck in his arm and was really sick." When asked whether "[Scolaro's] behavior when he came back to the car [was] similar to the other times [she] saw him after he used heroin," Worm replied, "Yes." Worm and Scolaro then went to Worm's residence. Worm recalled watching Scolaro prepare the heroin for injection by putting it into a spoon with a cotton ball and water and then heating the spoon underneath with a lighter. After the heroin liquified, she saw Scolaro draw the liquid into a syringe. Scolaro injected Worm with the heroin via the syringe. Worm initially testified that Scolaro prepared two syringes but clarified by stating, "Well, the [one syringe] I can only say, because I didn't actually see him prepare the [one syringe] he had injected himself with at the time." After receiving the heroin injection, Worm went into the kitchen to wash dishes. Scolaro remained in the living room. When she returned to the living room, she observed Scolaro and described his behavior as "[r]eally down, like chilled, laid back, wanted me to lay next to him on

the couch." Worm and Scolaro fell asleep on the couch and then went into the bedroom where they were physically intimate. Worm found Scolaro unresponsive at about 6:30 a.m. the following morning. Rescue personnel observed a possible puncture mark on the back of Scolaro's hand consistent with heroin use. Police also discovered drug paraphernalia, including syringes and a spoon.

Scolaro's death certificate listed the cause of death as "[a]cute [r]espiratory [f]ailure" as well as "[m]ethamphetamine and [h]eroin [o]verdose." The specimen inquiry listed the cause of death as "polydrug toxicity, with methamphetamine being the major contributing drug." The specimen inquiry also stated that Scolaro's blood had the presence of methamphetamine, amphetamine, pseudoephedrine, morphine, codeine, ethanol, alprazolam (Xanax) (an antianxiety drug), cotinine (a breakdown product of nicotine), and citalopram (an anti-depressant). Scolaro had received treatment at a hospital days before his death for neck pain, scalp sensitivity, and flu symptoms.

The emergency room physician testified that Scolaro died two to four hours before his body arrived at the emergency room. The medical examiner, Dr. Julie Netser, who observed several pinpoint marks on Scolaro's body, could not opine with confidence that they were needle marks. Dr. Netser stated, "He had several pinpoint, very subtle marks that I thought may have been needle tracks, but I was not 100 percent certain of that. I had never seen needle marks before, and his forearms and inside of his arms were heavily tattooed, which made looking for needle tracks difficult." Dr. Netser stated that in her opinion that the possible needle mark on the back of Scolaro's hand was not consistent with medical intervention. One suspected needle track was covered in a bruise that Dr. Netser testified would have taken at least a day to develop. Dr. Netser gave the cause of death as "polydrug toxicity."

Dr. Netser testified that methamphetamine, amphetamine, morphine, alprazolam, ethanol, citalopram, codeine, pseudoephedrine, and cotinine were found

in Scolaro's blood. Dr. Netser stated the presence of the first three narcotics "would suggest methamphetamine abuse." Dr. Netser acknowledged that finding morphine and codeine is "[one] of the more common ways you would get both drugs in a sample." According to Dr. Netser, "Heroin breaks down into morphine, so it's [one] of the degradation products. And then when heroin is produced, a lot of times there may be codeine contaminating the manufacture process, so you may get codeine as well." Dr. Netser also explained that typically blood is tested for 6-acetylmorphine ("6-AM"), which results from the breakdown of heroin. Dr. Netser indicated that Scolaro's blood and urine were tested for 6-AM, but that the results were negative. Dr. Netser explained that the absence of 6-AM could be because it "is a breakdown product of heroin that has a very short half-life, meaning that it degrades very quickly, so if the timing is not right, you may not find it."

Lastly, Dr. Netser qualified her prior statement of the cause of Scolaro's death as "polydrug toxicity, with methamphetamine being the major contributing drug." She also stated that she had "overstretched [her] area of expertise" in stating that methamphetamine was the major contributing drug. Nonetheless, she felt "confident that the cause of death was the combination of multiple drugs." She explained, "I don't think I took into account the fact that morphine, a benzodiazapine, which is alprazolam, and alcohol combined are a very lethal combination." Upon further research, she felt that the most significant drugs contributing to Scolaro's death were methamphetamine, morphine, alcohol, and Xanax. Dr. Netser stated, "[I]n doing more research, I think the combination of those other [three] drugs is a much more common cause of death in a multidrug toxicity than methamphetamine is." When asked whether "[her] opinion [was] that the morphine found in [Scolaro]'s system was a contributing factor to the death," she replied, "A contributing factor, yes." On cross-examination, Dr. Netser acknowledged that she could not say whether Scolaro would have died without the morphine in his system.

Dr. George Behonick, a forensic toxicologist, also testified and opined that the morphine in Scolaro's blood resulted from the presence of drugs that break down into morphine, including heroin. According to Dr. Behonick,

> Heroin chemically is known as diacetylmorphine. That is a chemical name for heroin. It has a very short half-life in the body. Roughly 2 to 6 minutes. Its first stage of metabolism is the loss of 1 of those groups known as an acetyl group, so it goes from being diacetylmorphine to monoacetylmorphine or sometimes it's referred to as 6-acetylmorphine. That represents an intermediate metabolite of heroin.

Dr. Behonick pointed out that 6-AM also has a "very short half-life" of between "6 to 26 minutes." Eventually, 6-AM breaks down to morphine. According to Dr. Behonick, 6-AM can be detected in blood for up to eight hours following ingestion of heroin and 6-AM is unlikely to be found in a test of a deceased person's blood if the person lived for three to fours hours after ingesting heroin.

Dr. Behonick stated that the morphine and codeine could have entered the blood by more than one means, including (1) separately, since morphine and codeine are both pain medications, or (2) the morphine could have resulted from the breakdown of heroin with codeine present because it may have been used in the heroin manufacturing process. Dr. Behonick ruled out codeine pain medication as a source of morphine, because the morphine concentration found in Scolaro's system was much higher than the codeine concentration. He ruled out poppy seeds as well because the level of morphine found in Scolaro's system was too high. He was not, however, able to rule out morphine pain medication as a source of the morphine, but he noted that there was no evidence that Scolaro was prescribed pain killers. Dr. Behonick testified that the presence of 6-AM is "definitive toxicological evidence of heroin use," whereas the lack of 6-AM does not rule out heroin use. Dr. Behonick concluded that heroin could have been the source of the morphine in Scolaro's blood and that a combination of the drugs found in Scolaro's system contributed to Scolaro's

-6-

death. Dr. Behonick believed the results of the 6-AM tests were inconclusive because of the short half-life of heroin.

Ford's expert witness, a pathologist, Dr. Henry Carson, testified that the most common source of morphine found in a human's system is morphine pain medication. He noted that codeine medicine and heroin are also common sources of morphine. In contrast to Dr. Behonick, Dr. Carson stated that 6-AM could be detected in urine for up to three days. Dr. Carson cited a handbook of AIT Laboratories, the same entity that conducted the blood and urine tests for Scolaro, for the proposition that 6-AM can be found in the system for up to four days. Like Dr. Behonick, Dr. Carson also felt that it would be unlikely to detect 6-AM if a person lived three to four hours after ingesting heroin. He also testified that the presence of alcohol in a person's bladder would dilute the concentration of other chemicals that might also be present in the urine. Dr. Carson also opined that the absence of 6-AM in Scolaro's test results excluded heroin as a source of morphine in this case. He further asserted that the toxicology reports indicated that the morphine came from codeine. Dr. Carson concluded that methamphetamine was the major cause of death and that the presence of the combination of morphine, codeine, Xanax, ethanol, and citalopram could also have contributed to Scolaro's death.

Other evidence admitted against Ford included an undercover officer's testimony that Ford distributed cocaine base and heroin to an undercover officer during a sting operation. Several former cellmates of Ford's testified that Ford had told them he supplied Scolaro with drugs (five said heroin and a sixth did not know the type of drug) the night that Scolaro died and that Ford sold drugs to an undercover police officer. Two of these witnesses also testified that Ford told Worm to put Scolaro in a tub with ice. One inmate witness was a former white supremacist and Ford is African-American. Ford and the prosecution stipulated that the residence from which Ford was said to have distributed controlled substances was near a school.

The prosecution also introduced evidence of Ford's additional criminal acts. Eleven days prior to Scolaro's death, police found approximately $11,000 in Ford's vehicle during a traffic stop, along with dryer sheets and laundry detergent. An officer testified that these items are typically used to mask the smell of narcotics to thwart detection by drug dogs. Ford had six prior felony drug convictions—five from 2008 and one from 1993—that the government wanted to enter into evidence using certified judgments. Prior to trial, Ford filed a motion in limine to exclude his criminal history and evidence relating to the traffic stop, arguing that they were unfairly prejudicial. The district court denied this motion, stating that the felony convictions went to knowledge and intent and were more probative than prejudicial and that the traffic stop was highly relevant and not unfairly prejudicial.

The jury convicted Ford on both counts. Ford was sentenced to life in prison (a life term for Count I and a 360-month term for Count II to run concurrently), ten years of supervised release for each count to run concurrently, and an assessment of $200.

## II. *Discussion*

On appeal, Ford argues that (1) there was insufficient evidence to support his conviction, (2) the district court erred in not granting Ford's motion for new trial based on the prosecution's alleged *Brady* violation, and (3) the district court erred in admitting evidence of Ford's prior convictions and bad acts.

## A. *Sufficiency of the Evidence*

Ford argues that there was no evidence that he transferred a controlled substance to Scolaro resulting in his death because Worm—the only witness present—never saw Ford and never saw Scolaro inject himself with heroin. Ford also points to evidence that Scolaro had been hospitalized in the days prior to his death as a possible explanation for his fatal overdose. Ford attacks the credibility of the medical examiner by arguing that she was not a forensically-trained pathologist. He

points out that the initial toxicology tests showed no signs of heroin in Scolaro's system. Ford also contends that the testimony that a codeine impurity in the heroin caused codeine to be present amounted to no more than conjecture because other testimony showed that the codeine could have come from other sources. Furthermore, Ford points to testimony that the absence of 6-AM excludes heroin. Ford states that he has not been able to find any cases where a defendant was convicted of distributing drugs that caused death when no medical evidence showed the presence of the drug in the decedent's body.

Ford challenges the credibility of the witnesses who had been incarcerated with him because each of them testified seeking sentence reductions. He noted that some witnesses testified that Ford told Worm to put Scolaro on ice the evening he overdosed so he would not overdose, facts that were not corroborated by other testimony showing that Scolaro was wet or cold. Ford also highlights that one witness was a known white supremacist and it was illogical that an African-American defendant would confide in a white supremacist with incriminating statements.

Ford argues that the government's case on the controlled buys fails because the purported conversation between Ford and an informant was only recorded from the informant's end, the informant was never searched after the controlled buy, and the recording equipment essentially failed. Ford also argues that the government's witness, the undercover officer, lacked credibility because he recounted that the drugs were thrown on the table in a public place, a highly unusual and indiscreet manner of drug distribution. Based on these various alleged evidentiary deficiencies, Ford avers that there was insufficient evidence to support his conviction.

> We review *de novo* the sufficiency of the evidence and view the evidence in the light most favorable to the verdict, giving it the benefit of all reasonable inferences. We reverse only if no reasonable jury could find the defendant guilty beyond a reasonable doubt. On appeal, we do not weigh the evidence or assess the credibility of the witnesses. Instead,

-9-

> the jury has sole responsibility for resolving conflicts or contradictions in testimony, and we must resolve credibility issues in favor of the verdict.

*United States v. Spears*, 454 F.3d 830, 832 (8th Cir. 2006) (citations omitted).

Verdicts may be "'based in whole or in part on circumstantial evidence.'" *United States v. Smith*, 104 F.3d 145, 147 (8th Cir. 1997) (quoting *United States v. Alvarado-Sandoval*, 997 F.2d 491, 493 (8th Cir. 1993)). "If the evidence rationally supports two conflicting hypotheses, [we] will not disturb the conviction." *United States v. Burks*, 934 F.2d 148, 151 (8th Cir. 1991) (citing *United States v. Holm*, 836 F.2d 1119, 1122 (8th Cir. 1988)).

Upon review, we conclude that the government presented sufficient, credible evidence to support Ford's conviction of distributing heroin that resulted in Scolaro's death and did so within a prohibited proximity of a school. The government had to prove beyond a reasonable doubt the following: (1) Ford knowingly and intentionally transferred heroin, in violation of § 841(a)(1); (2) this transfer was within 1,000 feet of a school, in violation of § 860(a); and (3) the heroin distributed resulted in Scolaro's death, in violation of § 841(b)(1)(C). *See United States v. Washington*, 596 F.3d 926, 944 (8th Cir. 2010). As for the third element, the government needed to show that the heroin entered Scolaro's body and contributed to his death.

First, seven witnesses, six of whom testified about jailhouse conversations, testified that Ford told them he had provided heroin to Scolaro the night of his death. Ford challenged their credibility at trial and does so again on appeal. Ultimately, their credibility assessment was a task for the jury after hearing all the evidence. *Spears*, 454 F.3d at 832. We are not persuaded to disturb their verdict. Additionally, Scolaro's girlfriend, Worm, testified that she took Scolaro to an area a few blocks from Ford's home in order for Scolaro to procure heroin. Worm observed Scolaro return to the

vehicle with heroin. Ford admitted that Scolaro came to his home seeking drugs the night Scolaro died, though Ford denied providing any drugs to Scolaro at that time. In a traffic stop prior to Scolaro's death and Ford's arrest, Ford was found with $11,000 in cash, along with dryer sheets and laundry detergent, which provide some evidence consistent with drug distribution activity. *See United States v. $141,770 in U.S. Currency*, 157 F.3d 600, 604 (8th Cir. 1998) (stating that the presence of large sums of cash "wrapped in scented fabric softener sheets" can be indicative of drug activity). Second, Ford and the prosecution stipulated that the residence from which Ford was said to have distributed controlled substances was within 1,000 feet of a school. While the government's proof was less than overwhelming, "[t]he jury's verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable-minded jury to conclude guilt beyond a reasonable doubt." *United States v. Erdman*, 953 F.2d 387, 389 (8th Cir. 1992).

The more difficult element for the government to prove was that Scolaro's death resulted from the heroin that Ford distributed. The government needed to show that Ford distributed heroin to Scolaro, that the heroin entered Scolaro's body, and that this heroin contributed to Scolaro's death. As previously explained, several witnesses testified that Ford provided heroin to Scolaro the night of his death, and Ford testified that Scolaro came to his home seeking drugs. Ford admitted to the jailhouse informants that he distributed heroin to Scolaro the night Scolaro died, and their testimony corroborated Worm's statement about her accompanying Scolaro to a place near Ford's residence but remaining in the car. Worm testified that she drove Scolaro to Ford's home and saw Scolaro return to the vehicle with heroin. This testimony, if believed, is sufficient to establish that Ford distributed heroin to Scolaro on the night of his death.

Although there is no direct evidence that Scolaro actually injected the heroin or otherwise put it into his body, circumstantial evidence supports the jury's finding. Worm recalls watching Scolaro prepare the heroin he procured from Ford for

injection by cooking it in a spoon with a lighter. She recalls seeing Scolaro put the heroin into a syringe and injecting the heroin into her arm. She did not see him inject himself but noted that when he returned to the car after obtaining the heroin that evening, Scolaro behaved as he did at other times when she knew he had injected heroin. When emergency personnel (EMT) arrived at the scene the following morning, Worm told at least one EMT that Scolaro had taken heroin. Scolaro's body bore pinpoint marks, which may have been needle marks, but the medical examiner could not deduce conclusively that they were upon examining the body. The presence of the marks did not prove Scolaro injected heroin or any other substance, but they were consistent with the testimony of Worm that Scolaro injected himself with heroin he acquired that evening from Ford.

The medical evidence does not by itself conclusively establish that Scolaro injected himself with heroin on the night of his death. Scolaro's specimen inquiry stated that the cause of death was "polydrug toxicity, with methamphetamine being the major contributing drug." The specimen inquiry also showed that Scolaro did not have heroin in his system at the time tested, but his system did contain the following other substances: methamphetamine, amphetamine, pseudoephedrine, morphine, codeine, ethanol, alprazolam (Xanax) (an anti-anxiety), cotinine (a breakdown product of nicotine), and citalopram (an anti-depressant). Although the cause of death on the death certificate was acute respiratory failure and methamphetamine and heroin overdose, the medical examiner eventually testified that the most significant drugs contributing to Scolaro's death were methamphetamine, morphine, alcohol, and Xanax. Scolaro had no actual heroin remaining in his system at the time of the testing, according to the medical testimony, but his system did contain the substances codeine and morphine, which are by-products of heroin decomposition. Both Scolaro's blood and urine 6-AM tests, which test whether the morphine found in the decedent's system was the by-product of heroin, came out negative. Thus, the 6-AM tests did not definitively determine that heroin had been in Scolaro's system, but neither did it conclusively rule out its presence at some point given the passage of time from

Scolaro's likely ingestion. However, the jury was presented with the testimony of Dr. Netser and Dr. Behonick, and, thus, the task of assessing the credibility and weight of their testimony.

In *Washington*, also a case involving a violation of § 841(a) and (b)(1)(C), the prosecution had to prove that the decedent had ingested Percocet, which was distributed to him by the defendant. 596 F.3d at 944. Percocet contains oxycodone and acetaminophen. *Id*. at 931 n.3. The toxicology report on the decedent showed the presence of oxycodone but did not include a test for acetaminophen; therefore, there was no proof that acetaminophen was present in the decedent's body. *Id*. at 944. The expert opined that the inability to show the presence of acetaminophen did not rule out the possibility that the decedent ingested Percocet. *Id*. He believed it likely that by the time of the toxicology testing, any acetaminophen present would already have been metabolized. *Id*. Thus, acetaminophen would not appear in the decedent's system, even if testing had been done, because acetaminophen is metabolized faster than oxycodone. *Id*. We held that testimony that acetaminophen metabolized faster than oxycodone, which was found in the decedent's system could still support the conclusion that Percocet was present at one point. *Id*. The present case is similar to *Washington* in that the narcotic originally alleged to have been ingested—heroin—was absent in its original form from the decedent's system. A heroin by-product, morphine, was present, but tests regarding whether that morphine resulted from the break down of heroin were inconclusive. Based on all the testimony before it, the jury could have rationally concluded that Scolaro died as a result of the ingestion of multiple narcotics, including heroin distributed to him by Ford.

Viewing the evidence in a light most favorable to the jury's verdict and not re-weighing the credibility of the witnesses, we conclude that sufficient evidence supports the jury's verdict.

B. *Motion for New Trial Based on* Brady *Disclosure Violation*

Ford argues that the government violated his Fifth Amendment due process rights under *Brady v. Maryland,* 373 U.S. 83 (1963). Specifically, he asserts that the government unfairly prejudiced his defense by not disclosing that Worm was providing testimony under the protection of an informal immunity agreement. Ford's counsel did not discover this arrangement between Worm and the government until after the trial. Ford bases his argument on the stipulated discovery order and an email from Worm's attorney stating an understanding between the U.S. Attorney and Worm. This email to Ford's counsel stated: "There was never any formal written immunity letter or agreement, so it would not have been in discovery. Our understanding between myself and the US Attorneys Office is that as long as [Worm] told the truth, she would not be charged."

Ford contends that if he had known about the informal deal, he would have had defense counsel cross-examine Worm about her motive to testify. Ford argues that (1) the "immunity agreement" referenced in the email could have been used for impeachment purposes to discredit Worm; (2) he reasonably relied on the prosecution's open-file policy that it would disclose evidence; (3) he would not have had to scavenge for undisclosed *Brady* material; and (4) the suppressed evidence was prejudicial because Ford lacked proof of motive for Worm's testimony. Ford argues that the failure to disclose the informal immunity agreement necessitates a new trial.

"We review the denial of a motion for a new trial based on a *Brady* violation for an abuse of discretion." *United States v. Ladoucer*, 573 F.3d 628, 636 (8th Cir. 2009). The elements of a *Brady* violation are as follows: "(1) the evidence was favorable to the defendant, (2) the evidence was material to guilt, and (3) the government suppressed the evidence." *Id*. The Supreme Court has held that a new trial was warranted where the prosecution gave an informal immunity promise to a key co-conspirator witness, who was the only witness linking the defendant to the

offense, and where the witness denied on the stand that a deal existed. *Giglio v. United States*, 405 U.S. 150, 153–54 (1972). The Court noted that the prosecution's case "depended almost entirely on [the witness's] testimony; [and] without it there could have been no indictment and no evidence to carry the case to the jury." *Id*. at 154. Materiality of the undisclosed evidence is an important consideration in deciding whether a new trial is warranted. *Id*. at 154. The "'mere possibility'" that the undisclosed item "might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.'" *United States v. Bigeleisen*, 625 F.2d 203, 208 (8th Cir. 1980) (quoting *United States v. Agurs*, 427 U.S. 97, 109–10 (1976)). Moreover, the prosecution's failure to disclose adverse credibility findings does not necessarily warrant a new trial if there is other overwhelming evidence against the defendant. *United States v. Jeanpierre*, 636 F.3d 416, 423–24 (8th Cir. 2011).

The district court denied Ford's new trial motion after concluding that no *Brady* violation occurred. First, the court found that there was no immunity agreement, informal or otherwise, to disclose. When questioned about his email to Ford's counsel, Worm's counsel could not recall an immunity agreement. The court construed the statement in the memo referencing an "understanding between myself and the US Attorney's Office" that Worm should face no prosecution if she testifies truthfully as merely a warning against committing perjury and not proof of an informal immunity agreement. We agree with the district court.

We hold that the court did not abuse its discretion in denying the motion for a new trial.

### C. *Admission of Prior Convictions and Bad Acts*

Ford argues in a supplemental brief that his criminal history was admitted into evidence at trial as inadmissible propensity evidence and should have been excluded. The government moved to strike the supplemental brief, and we now consider the government's motion. Under Federal Rule of Appellate Procedure 10(b)(1), an

appellant is required to "[w]ithin 14 days after filing the notice of appeal" order a transcript regarding the appeal issue. This court cannot conduct a meaningful review without a transcript of the proceedings. *See, e.g. Droste v. Julien*, 477 F.3d 1030, 1034–35 (8th Cir. 2007). The only documentation that Ford provides regarding transcripts from the motion in limine hearing regarding admissibility of evidence was an authorization-for-payment request to the district court dated February 9, 2012. The district court denied this request because of "no showing of necessity." Ford asserts in his supplemental brief that his case is "virtually identical" to the Seventh Circuit case, *United States v. Miller*, 673 F.3d 688 (7th Cir. 2012), which was decided on March 12, 2012. Ford did not renew his request for a transcript after *Miller* was decided, after he decided to appeal this new issue, or after he was granted leave to appeal the new issue. Since we are unable to conduct a meaningful review without the transcript and Ford has not provided a plausible justification for failing to provide it, we grant the government's motion to strike the supplemental brief.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____