940 F.2d 286
 UNITED STATES of America, Appellee,
v.
Cedric PAYNE, Appellant.
UNITED STATES of America, Appellee,
v.
Eileen MAIER, Appellant.
UNITED STATES of America, Appellee,
v.
Ray RANSOM, Appellant.
UNITED STATES of America, Appellee,
v.
Anthony ALEXANDER, Appellant.
UNITED STATES of America, Appellee,
v.
Melvin HICKS, Appellant.
UNITED STATES of America, Appellee,
v.
Marvin BOGAN, Appellant.
UNITED STATES of America, Appellee,
v.
Kim CUELLAR, Appellant.
 Nos. 90-1262, 90-1270, 90-1271, 90-1282, 90-1283, 90-1298
and 90-1299.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 10, 1990.
Decided June 28, 1991.
Rehearing and Rehearing En Banc Denied in No. 90-1271 Aug.
12, 1991.
Rehearing and Rehearing En Banc Denied in Nos. 90-1262,
90-1282 and 90-1298 Aug. 20, 1991.
 
 Jerry L. Soucie, West Chester, Pa., Bernard Glaser, Rick G. Wade, Lincoln, Neb. (Toney Redman, Peter K. Blakslee, Paul M. Conley, Douglas E. DeLair, Lincoln, Neb., on briefs), for appellants.
 Bruce W. Gillan, Lincoln, Neb. (Gregory R. Hoffman, on brief), for appellee.
 Before WOLLMAN, Circuit Judge, and HEANEY and FRIEDMAN*, Senior Circuit Judges.
 WOLLMAN, Circuit Judge.
 
 
 1
 Seven defendants appeal their convictions and sentences, the consequences of their involvement in a cocaine distribution conspiracy in Lincoln, Nebraska. We affirm the decision of the district court.[1]
 
 I.
 
 2
 Ray Ransom, Anthony Alexander, Melvin Hicks, Marvin Bogan, Kim Cuellar, Eileen Maier, Cedric Payne, and four other defendants were charged in a fifteen-count indictment with conspiracy to distribute cocaine, use of a telephone to facilitate a conspiracy to distribute cocaine, possession with intent to distribute cocaine, and twelve counts of distribution of cocaine, in violation of 21 U.S.C. Secs. 846, 843(b), 844, and 841(a)(1). Each of the defendants was charged with the fourteen substantive offenses pursuant to the holding in Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).
 
 
 3
 Beginning in the summer of 1987, Ray Ransom, the apparent ringleader, supplied cocaine to the Lincoln, Nebraska, area by dispatching couriers from Florida. Two couriers, Amos James and Allen Powell, would "body carry" powder cocaine on airline flights to Omaha, where various distributors employed by Ransom would pick up the cocaine for sale in Lincoln. Ransom's first contact in Lincoln was Houston Nalls, whom Ransom had known previously. The conspiracy lasted from approximately June 1987 through December 1988.
 
 
 4
 Lincoln police got wind of Ransom's drug enterprise in September 1987 when Ransom attempted to send a football filled with 136.1 grams of cocaine to Gavin Gaskins, a cocaine distributor in Lincoln introduced to Ransom by Nalls. Florida police intercepted the football and alerted Lincoln police. Thereafter, Lincoln police conducted undercover operations to ascertain the extent of Ransom's drug enterprise in Lincoln.
 
 
 5
 During the fall of 1987, Ransom developed a relationship with Bettie Brown, a resident of Lincoln. Ransom persuaded Brown to store cocaine at her house. Brown testified at trial that one of Ransom's distributors would pick up cocaine from James or Powell in Omaha and then deliver it to Brown's for storage. Brown would await instructions from Ransom before distributing eighth-ounce packets to Ransom's network of dealers. According to Brown's testimony, during his visits to Lincoln in 1987 and 1988 Ransom conducted numerous closed door meetings at Brown's residence with his distributors, including Houston Nalls, Gavin Gaskins, Anthony Alexander, Melvin Hicks, Marvin Bogan, and Eric Beckwith.
 
 
 6
 Anthony Alexander commanded a dominant position in the chain of command. Alexander was often called upon to retrieve cocaine from the couriers who flew into Omaha. He was not trusted, however, to warehouse the cocaine. Alexander brought cocaine from Omaha to Bettie Brown. Ransom then instructed Brown when to distribute cocaine to Alexander, presumably as Alexander paid for the cocaine by wiring money to Florida. Alexander disbursed cocaine to several other dealers, including Melvin Hicks, Marvin Bogan, and Eric Beckwith.
 
 
 7
 Eric Beckwith cooked the cocaine down to crack--what in the drug trade is called "rocking it up." Beckwith converted cocaine into crack at Eileen Maier's house and Kim Cuellar's house. Some of the cocaine was made into crack to increase the potential profit, rocks of which were sold for $60 to $75 by each member of the conspiracy.
 
 
 8
 Bettie Brown's cousin, Melvin Hicks, acted as a cocaine distributor in Lincoln. Hicks sold crack to Morrie Jsames, a police informer, twice in December of 1987 at Eileen Maier's home on Mohawk Street in Lincoln. Gavin Gaskins testified that he sold cocaine to Hicks on more than one occasion, and Bettie Brown testified that Hicks was often a participant in the closed door meetings at her house. Hicks was often present when cocaine was purchased from other dealers in the conspiracy.
 
 
 9
 Marvin Bogan also distributed cocaine in Ransom's network. Officer Cindi Arthur testified that she went to Carolyn Lockett's apartment to arrange a purchase of cocaine in February 1988. Lockett made a call to a pager to arrange the buy. As Lockett and Arthur left the apartment, Marvin Bogan arrived. Lockett spoke with Bogan and told Arthur that Bogan had $75 rocks of crack in the car, but they would have to follow Bogan to Cuellar's home if they wanted $60 rocks of crack. Arthur waited outside while Lockett purchased cocaine at Cuellar's, and observed Bogan get into a car registered to Eileen Maier. Bogan, like Hicks, sold crack to Morrie Jsames and was often present when other dealers sold cocaine to informers.
 
 
 10
 Kim Cuellar lived with Alexander and distributed cocaine for him when dealers came for their orders. Another girlfriend of Alexander's, Eileen Maier, also distributed cocaine for him and picked up shipments of drugs from Bettie Brown. Brown testified that Maier brought a courier, Alan Powell, from Omaha to Lincoln on one occasion. Much of the drug activity of the conspiracy took place at Cuellar's home on North 22nd Street and Maier's home on Mohawk Street in Lincoln.
 
 
 11
 Gaskins testified that he sold cocaine to Cedric Payne and that Payne indicated that he had people waiting to buy from him. Payne often smoked crack at Maier's residence with a girlfriend or with Eric Beckwith. Susan Rhodus, an unindicted co-conspirator, testified that Payne bought and sold cocaine and provided her with cocaine on numerous occasions.
 
 
 12
 Morrie Jsames, a police informer, made numerous controlled buys of cocaine and crack from Hicks, Bogan, Alexander and Cuellar in December 1987 and January 1988. Jsames testified to purchases, listed below, which correspond to counts of the indictment:
 
 
 13
 Count Date Seller Place
II 12/11/87 Melvin Hicks Maier's, Mohawk Street
III 12/17/87 Melvin Hicks Maier's, Mohawk Street
IV 1/6/88 Marvin Bogan Maier's, Mohawk Street
V 1/13/88 A. Alexander Maier's, Mohawk Street
VII 2/12/88 A. Alexander Maier's, Mohawk Street
XII 3/10/88 Kim Cuellar Cuellar's, North 22nd
XIII 3/10/88 A. Alexander Cuellar's, North 22nd
----------
 
 
 14
 Cindi Arthur, an undercover Lincoln police officer, arranged for controlled buys of cocaine and crack by Carolyn Lockett in February and March 1988 which also correspond to the indictment:
 
 
 15
 Count Date Place
VI 2/11/88 Cuellar's, North 22nd
VIII 2/16/88 Maier's, Mohawk Street
IX 2/20/88 Cuellar's, North 22nd
X 2/24/88 Cuellar's, North 22nd
XIV 3/10/88 Cuellar's, North 22nd
----------
 
 
 16
 Gavin Gaskins and Bettie Brown testified that Ransom instructed his co-conspirators to wire money to Florida through Western Union. Lincoln police obtained records from Western Union of wire transfers of large amounts of money from Lincoln to Ransom in Florida. Western Union employees identified Gavin Gaskins, Bettie Brown, Houston Nalls, Kim Cuellar, Anthony Alexander, Eileen Maier, and Ransom himself as customers who used fictitious names to send money to Ransom. Between August 7, 1987, and December 1, 1988, approximately $161,000 was sent under a variety of false names and addresses to several different names in Florida. Western Union records revealed that members of the conspiracy continued to send money to Florida after their arrests on March 11, 1988. Bettie Brown testified that she continued to receive and distribute cocaine until May or June 1988.
 
 
 17
 Two defendants indicted for involvement in this drug conspiracy remain at large, Amos James and Alan Powell. Bettie Brown and Houston Nalls, indicted with the others, entered into plea agreements with the government. Brown testified at trial. Other co-conspirators cooperated with the government, were not indicted, and testified at trial against the seven defendants who now appeal their convictions and sentences.
 
 II.
 
 18
 Each of the seven defendants argues that various errors were made at trial and in sentencing. We conclude that the trial issues do not require reversal of the district court's decision and that the terms of imprisonment imposed by the district court conform to the requirements of the Sentencing Guidelines.
 
 A. Bettie Brown's Testimony
 
 19
 Each defendant argues that because the testimony of Bettie Brown was tainted by what they characterize as a contingent plea agreement, their rights to due process were violated. Defendants rely on United States v. Waterman, 732 F.2d 1527 (8th Cir.), cert. denied, 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985). There, a panel of this court reversed a conviction on the basis of testimony given pursuant to a plea bargain. The full court then vacated the panel decision and affirmed the conviction by an equally divided court, sitting en banc. Waterman thus has no precedential value; moreover, it is distinguishable from this case. See United States v. Fazzino, 765 F.2d 125, 126 (8th Cir.), cert. denied, 474 U.S. 851, 106 S.Ct. 150, 88 L.Ed.2d 124 (1985). In Waterman, the prosecution's favorable recommendations for the witness' sentence depended on whether his "truthful testimony led to further indictments." 732 F.2d at 1530. Here, as in United States v. Spector, 793 F.2d 932, 936-37 (8th Cir.1986), cert. denied, 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987) and United States v. Moeckly, 769 F.2d 453, 463 (8th Cir.), cert. denied, 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 357 (1986), Bettie Brown's plea bargain was not contingent upon the content and results of her testimony--the concern of the panel in Waterman.
 
 
 20
 Outside the presence of the jury, Bettie Brown testified that it was her understanding that some conspirators would have to be convicted in order for her to gain the benefits of her plea agreement with the government. The agreement itself, however, does not require a conviction. In relevant part, it provides:
 
 
 21
 Should you fully comply with all the terms of this agreement, and the United States concludes that this compliance includes a good faith effort to provide substantial assistance in the investigation or prosecution of another person who has committed an offense, the United States shall file, prior to sentencing, a motion pursuant to 18 U.S.C. Sec. 3553(e) and policy statement Sec. 5K1.1, United States Sentencing Commission Guidelines Manual, for a departure from the sentencing guidelines. It shall remain within the total discretion of the sentencing judge whether to grant this motion and to what extent, if any, the sentence imposed shall depart from the guidelines.
 
 
 22
 The following day, again outside the presence of the jury, Brown testified that she had been confused as to the meaning of the agreement and that it was now her understanding that no conviction was necessary for her to get the benefit of her bargain. A full reading of Brown's testimony during both sessions before the court reveals the confusion she experienced when questioned about her responsibilities under the plea agreement.
 
 
 23
 The district court decided that Brown's agreement did not place her in a position that put her "under such strain or control or impossible situation that the defendants [were] deprived of a fair opportunity to confront her." (Tr. 1581). We agree with the district court. The plea agreement was admitted into evidence, and Brown was cross-examined extensively regarding her understanding of the agreement. Thus, the jury had ample opportunity to judge her motivation to testify as she did. The existence and contents of Brown's plea agreement were precisely the sort of thing that affected the weight of her testimony, not its admissibility, and furthermore provided abundant material for impeachment and cross-examination. Spector, 793 F.2d at 936-37; Moeckly, 769 F.2d at 462-63.
 
 
 24
 We rely on the district court's determination that Brown was not so tied to producing the conviction of another that she would skew her testimony to obtain the desired result. The credibility of Brown's testimony was for the jury to decide. Under the rigors of the vigorous cross-examination by defense counsel, any bias or prejudice underlying her testimony was surely demonstrated to the jury. We are satisfied that the jury was able to judge for itself the weight and truthfulness of Brown's testimony.
 
 B. Gavin Gaskins' Testimony
 
 25
 The defendants argue that their due process rights under the fifth amendment were abridged because the government submitted Gavin Gaskins' testimony regarding the conspiracy notwithstanding its knowledge that Gaskins had perjured himself in roughly five statements. Gaskins testified, among other things: (1) that he did not know that there was cocaine in the football that Ransom sent him in September 1987; (2) that he distributed only one ounce of cocaine between October 1987 and January 1988; (3) that he did not know that any of his contacts with Ransom were connected with the distribution of cocaine before September 25, 1987; (4) that he was at Bettie Brown's residence only on one or two occasions; and (5) that he did not deal in cocaine with Ransom at Brown's home when Brown was present. The defendants claim that each of these statements was false and that the government knew of Gaskins' perjury.
 
 
 26
 It is true that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (footnotes omitted). We recognize, however, that it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements, and not every contradiction in fact or argument is material. United States v. Bigeleisen, 625 F.2d 203, 208 (8th Cir.1980).
 
 
 27
 The defendants argue that the reasoning of Sanders v. Sullivan, 863 F.2d 218 (2nd Cir.1988), requires us to reverse their convictions. We do not perceive Gaskins' testimony to rise to the level of tainted evidence discussed in Sanders and the cases examined therein. In Sanders, a witness recanted the key testimony on which the defendant's conviction was based. A credible recantation of perjured testimony, however, differs from Gaskins' testimony in kind rather than just in degree. The same distinction can be drawn between the present case and Bigeleisen. In Bigeleisen, the witness denied the existence of the plea-bargained arrangement for testimony he had with the government, and the prosecution failed to correct the falsehood. There, we held that the failure to disclose such material information likely affected the outcome of a trial. Bigeleisen, 625 F.2d at 208-09. We cannot say the same here.
 
 
 28
 The inconsistencies in Gaskins' allegedly false statements were brought out during trial. The defendants had access to information, such as police reports and other witness' testimony, which revealed contradictions between what Gaskins told to investigators and what he testified to at trial. Although Gaskins may have understated his involvement in the conspiracy, he did not falsely implicate anyone. In fact, we note that had Gaskins testified to what the defendants claim is "the truth," his testimony would have been more damaging to the defendants than was the testimony he actually gave.
 
 
 29
 The truth is an elusive concept. It is the function of the jury to decide just what the truth is, and just who is telling it. We regard the jury as the vehicle which determines issues such as this with the requisite level of good sense and wisdom, and the district court rightly left the jury to its task.
 
 
 30
 Ransom, Bogan, Hicks, Maier, Cuellar, and Payne argue that the district court erred in not instructing the jury as they requested regarding Brown's and Gaskins' testimony. The defendants requested a particularly worded instruction on informant credibility and a falsus in uno, falsus in omnibus instruction. Neither instruction was required. The district court properly instructed the jury that their role was to judge the credibility of the witnesses and to gauge the weight that should be given to a particular witness' testimony.
 
 
 31
 Having reviewed the defendants' other arguments concerning the admissibility of evidence of documents from Western Union, Florida drivers' licenses, the identification procedures, and the statements of co-conspirators, we conclude that reversal of the defendants' convictions is not required. The district court's well-reasoned memorandum denying defendants' motions for judgment of acquittal answers the defendants' arguments, and we find little to add to its comprehensive explanation. The overwhelming evidence of the defendants' involvement in a complex and extensive drug conspiracy compels us to affirm all of the convictions.
 
 III.
 
 32
 Ransom and Alexander take issue with the evidence heard at sentencing and with the standard of proof required for the government to establish facts relevant to their sentences.
 
 
 33
 With respect to the standard of proof at sentencing, the particulars used to determine the length of incarceration to be imposed under the Sentencing Guidelines need only be proved by a preponderance of the evidence. United States v. Sleet, 893 F.2d 947, 949 (8th Cir.1990). We conclude that that standard was met in this case.
 
 
 34
 At the sentencing hearing, a co-conspirator corroborated information in the presentence reports prepared by probation officers. The district court clearly stated that it did not rely on facts in the presentence report that were disputed by the defendants and not corroborated by the co-conspirator, as required by our decision in United States v. Fortier, 911 F.2d 100, 103 (8th Cir.1990). It was not error for the district court to consider testimony and information it deemed reliable and proved by a preponderance of the evidence in determining the defendants' sentences.
 
 
 35
 Ransom, Alexander, Bogan, Hicks, and Payne argue that the district court increased their sentences unfairly by considering the conduct of co-conspirators in determining their individual base offense levels. Under Guidelines Sec. 1B1.3(a)(1), the court must determine the base offense level by considering all acts that were part of the conspiracy. Application note 1 of Guidelines Sec. 1B1.3 instructs the district court to consider that "[i]n the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant 'would be otherwise accountable' also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant."
 
 
 36
 Each of these defendants was aware of the conspiracy in which the defendants were involved and of the amount of drugs being bought and sold at their direction. The district court considered each defendant individually, gauging each defendant's relative involvement and his or her knowledge of the quantities of cocaine and crack distributed in Lincoln through this drug ring. The leaders of this enterprise, Ransom and Alexander, were properly accountable for the total weight of cocaine and crack proved at trial and at sentencing. Ransom and Alexander directed, or were aware of, all shipments of cocaine that were made to further the enterprise, ordered the manufacture of crack from the powdered cocaine, managed the distribution of drugs, and arranged for the wire transfer of money. Although Bogan and Hicks were a part of the drug ring, the district court found that they were not tied to the conspiracy after March 11, 1988. This was not error. We conclude that the district court correctly calculated the defendants' base offense levels under the Guidelines, as determined by the total amount of cocaine and crack implicated in the conspiracy that was foreseeable to each defendant.
 
 
 37
 Ransom, Alexander, Payne, and Cuellar argue that their sentences were unconstitutionally imposed because the indictments charged against them failed to specify that cocaine base (crack) would be included in determining the amount of drugs used in calculating their sentences. In United States v. Lawrence, 915 F.2d 402, 406-07 (8th Cir.1990), we discussed the Guidelines approach that requires consideration of types and quantities of drugs not specified in the count of conviction. We adopt that reasoning here. See also Guidelines Sec. 1B1.3, Application Notes, Background: "[I]n a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." Whether uncharged drugs are part of a common scheme or plan is a factual finding, which will be disturbed only if clearly erroneous. Sleet, 893 F.2d at 949. We have no doubt that the crack for which defendants were sentenced was part of the same conspiracy as charged in the counts of conviction.
 
 
 38
 Cuellar challenges the district court's upward departure of ten months from the sentence recommended by the Guidelines. We agree with the district court that the criminal history score assigned to Cuellar did not adequately reflect the severity of her past illicit activity. We review the district court's departure on an abuse of discretion standard, and we accept the reasons for the upward departure as adequate. United States v. Snover, 900 F.2d 1207, 1209 (8th Cir.1990).
 
 
 39
 Alexander and Payne argue that the district court improperly considered certain prior convictions in assessing their criminal histories. We conclude that their arguments are without merit.
 
 
 40
 The convictions and sentences imposed thereon by the district court are affirmed.
 
 
 41
 HEANEY, Senior Circuit Judge, concurring in part and dissenting in part.
 
 
 42
 I agree that the convictions of these seven defendants should be affirmed, and I join in Part II of the court's opinion. I dissent in part from Part III of the court's opinion because the district court improperly enhanced the sentences of Payne, Ransom, and Alexander by basing their offense level on amounts of crack cocaine that were not charged in the indictment and were not proven at trial.
 
 
 43
 There was sufficient evidence to support the charge in the indictment that the defendants conspired to distribute powder cocaine. The indictment, however, neither specified the amounts of powder cocaine involved in each count nor alleged anywhere that the conspiracy involved crack. This practice should not be permitted because it gives the prosecution the opportunity to "indict for less serious offenses which are easy to prove and then expand them in the probation office." United States v. Ebbole, 917 F.2d 1495, 1501 (7th Cir.1990) (quoting United States v. Miller, 910 F.2d 1321, 1332 (6th Cir.1990) (Merritt, C.J., dissenting)). See also United States v. Kikumura, 918 F.2d 1084, 1121 (3d Cir.1990) (Rosenn, J., concurring). Unfortunately, that is exactly what happened here.
 
 
 44
 The district court found that Alexander and Ransom were responsible for distributing 65 ounces or 1,843 grams of powder cocaine. The court reached this conclusion by reviewing evidence presented at trial. That evidence indicated that members of the conspiracy bought cocaine by transferring money from Nebraska to Florida, that Ransom and Alexander were responsible for some $156,875 of those money transfers, and that the $156,875 would buy approximately 1,843 grams of powder cocaine. There is adequate support in the record for these findings, and the district court's conclusion that Ransom and Alexander were responsible for distributing 1,843 grams of powder cocaine is not clearly erroneous.
 
 
 45
 Had these two defendants been sentenced on the basis of the 1,843 grams of powder cocaine, I would have no difficulty affirming both their convictions and their sentences. The district court, however, also found that about approximately 191 grams of the 1,843 grams of powder cocaine had been converted into 40 grams of crack cocaine by Ransom and Alexander. These 40 grams of crack are, for sentencing purposes, the equivalent of 4,000 grams of powder cocaine. The district court added these 4,000 grams to the remaining 1,652 grams of powder cocaine for a total of 5,652 grams. The resulting base offense level was 32, six levels higher than that for the original 1,843 grams of powder cocaine. The effect of this "conversion to crack" was to more than double Ransom's sentence and to nearly double Alexander's:
 
 
 46
 Alexander Ransom
Final offense level & guidelines range based 32/III (151188 30/I (97121
 on 1,843 g. powder cocaine months) months)
Final offense level & guidelines range based 38/III (292365 36/I (188235
 on 1,652 g. powder cocaine k 40 g. crack months) months)
 cocaine
Sentence imposed 292 months 225 months
 
 
 47
 Likewise, the district court sentenced Payne on the basis of 1.97 grams of crack cocaine, which under the guidelines equals 197 grams of powder cocaine. The conversion of powder cocaine into crack cocaine at least doubled Payne's sentence:
 
 
 48
 Payne
Final offense level & guidelines range based on 1.97 g. 10/II (814 months)
 powder cocaine
Final offense level & guidelines range based on 1.97 g. 16/II (2430 months)
 crack cocaine
Sentence imposed 30 months
----------
 
 
 49
 These three sentences were increased because the guidelines provide a much stiffer penalty for the distribution of crack than for powder cocaine. U.S.S.G. Sec. 2D1.1, comment (Drug Equivalency Tables). No record has been made in this case to challenge the Sentencing Commission's action in making this 100 to 1 equivalence, even though the standard may well impact more severely on black defendants than on white defendants. This, however, does not excuse the government's failure to charge that these defendants were members of a conspiracy whose purpose was to distribute powder cocaine and crack cocaine.[2] Indeed, some United States Attorneys make it a practice to charge crack cocaine, and there is no good reason why crack cocaine could not have been charged here, as law enforcement officials were aware of the nature of the drugs involved in the conspiracy before the indictment was returned.
 
 
 50
 The government's failure to charge crack meant that the defendants did not have notice of the charges and likely penalties against them. It is true that the ultimate sentences here were within statutory limits, but that fact means little. Under the guidelines regime, it is the guidelines range and not the statutory maximum that determines the punishment received by the vast majority of defendants. In any event, Congress set maximum sentences at a time when prisoners were eligible for parole, see United States v. Brady, 928 F.2d 844, 852 (9th Cir.1991), and prisoners served, on the average, less than half the sentence imposed. U.S. Dep't of Justice, Federal Bureau of Prisons, Statistical Report, Fiscal Year 1986 at 12 (1987). As a result, an offender sentenced under the guidelines who receives a sentence that is below the statutory maximum may well serve far more time in prison than an individual sentenced to the statutory maximum in the preguidelines era.
 
 
 51
 The failure to charge crack also allowed the government to use the sentencing proceeding, with its lower burden of proof and relaxed evidentiary safeguards, to dramatically enhance the sentence of these defendants. I do not believe the existence of crack to be merely a "sentencing fact" when such a factual finding can mandate a doubling or tripling of a defendant's sentence. Uncharged conduct, as in this case, can become "the tail that wags the dog" of the substantive offense, and failure to prove such conduct beyond a reasonable doubt violates the due process clause of the Constitution. Cf. McMillan v. Pennsylvania, 477 U.S. 79, 88, 106 S.Ct. 2411, 2417, 91 L.Ed.2d 67 (1986).
 
 
 52
 For this reason alone, I believe the cases of all three should be remanded for resentencing based on powder cocaine only. If this were done, the sentencing ranges would be 151-188 months for Alexander, 97-121 months for Ransom, and 8-14 months for Payne.
 
 
 53
 There is an additional reason why the matter should be remanded as to Payne and Ransom: no evidence at trial showed these two had participated in the distribution of crack cocaine. At sentencing the only evidence linking Ransom with the distribution of crack was a paragraph in an affidavit by Detective Michael Garnett that contained the following hearsay and double hearsay:
 
 
 54
 I spoke with Greg Rohleder who told me that he saw Ray Ransom with packages of powdered cocaine and "crack" strapped to Ransom's body during the summer of 1987, which Ransom had carried to Nebraska form [sic] Florida; Stan Stoy of the FBI told me that Amos James, who had entered into a plea agreement with the government, told Stoy that in October or November of 1987, Ransom told James that the cocaine he shipped to Nebraska, was being made into "crack" by Ransom's customers;
 
 
 55
 This "evidence" is just too flimsy to serve as a basis for doubling Ransom's sentence.
 
 
 56
 Likewise, there was no evidence presented at trial to indicate that Payne ever distributed crack or knew that anyone else involved in the cocaine conspiracy was doing so. While Payne was convicted of four substantive counts that apparently involved 1.97 grams of crack, his conviction was on a Pinkerton theory. To secure a conviction, the government did not need to prove that crack cocaine was involved. It needed to show only that cocaine was involved. Thus, Payne's conviction on the four substantive counts, without more, is inadequate proof that Payne knew that crack or anything other than powder cocaine was involved during those four offenses. To sentence Payne on the basis of crack cocaine is an unwarranted expansion of Pinkerton.
 
 
 57
 The majority opinion relies on United States v. Lawrence, 915 F.2d 402 (8th Cir.1990), to support the proposition that defendants may be sentenced on the basis of types of drugs not charged in the indictment. I do not agree with this proposition, but even if I did, Lawrence does not apply to this case. In Lawrence, the defendant was charged with conspiracy to distribute marijuana. At sentencing, the government presented evidence showing that the defendant personally sold cocaine as part of the same conspiracy, and the district court accordingly based Lawrence's sentence in part upon the cocaine that Lawrence himself had sold.
 
 
 58
 In Payne's case, however, the government presented absolutely no evidence at sentencing showing that Payne personally sold crack cocaine as part of a pattern of uncharged conduct. The government points to sentencing testimony presented by a crack cooker named Eric Beckwith, but that testimony establishes only that Payne went to Alexander's house in August 1987 and purchased and smoked some crack there. This certainly does not establish that Payne distributed crack.
 
 
 59
 For the foregoing reasons, I dissent as to the sentences imposed on Alexander, Ransom, and Payne. I concur in all other respects.
 
 
 
 *
 The HONORABLE DANIEL M. FRIEDMAN, United States Senior Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 The Honorable Warren K. Urbom, United States Senior District Judge for the District of Nebraska
 
 
 [2]
 Although the government should have charged all defendants as to crack cocaine, the district court's decision to sentence on the basis of crack as well as powder cocaine affected only the sentences of Payne, Alexander, and Ransom