# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3678

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Missouri. |
| Burl Washington, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: September 25, 2009
Filed:  March 5, 2010

_____

Before LOKEN, Chief Judge, WOLLMAN and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

After a jury trial in which Burl Washington represented himself, he was convicted of two counts of distribution of a controlled substance resulting in the death of another person ("Count I and II"), see 21 U.S.C. § 841(a), (b)(1)(C), and two counts of distribution of a controlled substance ("Count III and IV"), see id. § 841(a). The district court[1] sentenced Washington to 360 months imprisonment for his Count I and II convictions and 240 months imprisonment for his Count III and IV convictions, to be served concurrently.  On appeal, Washington challenges only his

_____

[1]The Honorable Catherine D. Perry, Chief Judge, United States District Court for the Eastern District of Missouri.

Count I and II convictions, alleging that: (1) the district court erred in granting his request to represent himself, (2) the evidence was insufficient to support the verdicts, (3) the district court erred by admitting evidence of Washington's drug transactions which were the basis of Count I and II, and (4) the district court erred in instructing the jury as to Count I and II. We affirm.

## I.

"We state the facts in the light most favorable to the jury verdict." United States v. Jenkins-Watts, 574 F.3d 950, 956 (8th Cir. 2009). In November 2005, Heather Deering began purchasing Fentanyl patches[2] and Percocet tablets[3] from Burl Washington two to three times a week. Washington also provided Fentanyl patches and Percocet tablets to Lacy Cole, Deering's best friend. Washington removed the manufacturer's labels from the Fentanyl patches prior to distributing them.

John Lochirco, Deering's boyfriend, and his best friend, Justin Knox, expressed interest in the Fentanyl patches, so Deering contacted Washington and introduced him to Lochirco. Lochirco contacted Washington on his cellular phone in order to arrange drug purchases,[4] and Lochirco and Knox, together, met Washington on multiple

---

[2]A Fentanyl patch is described as "a transdermal system providing continuous systemic delivery of fentanyl, a potent opioid analgesic, for 72 hours." Physicians' Desk Reference 2346 (64th ed. 2010).

[3]"Each tablet, for oral administration, contains oxycodone hydrochloride and acetaminophen . . . ." Physicians' Desk Reference 1121 (64th ed. 2010). "Oxycodone . . . is a semisynthetic opioid analgesic . . . ." Id. "Acetaminophen is a popular non-opioid pain reliever, more commonly known by the brand name Tylenol®." Ortho-McNeil Pharm., Inc. v. Teva Pharm. Indus., Nos. 2008-1549, 2008-1550, 2009 WL 2604919, at *1 (Fed. Cir. Aug. 26, 2009) (unpublished).

[4]Drug Enforcement Administration Task Force Officer Michael Bradley obtained Washington's telephone records and highlighted calls between Washington

occasions in order to purchase Fentanyl patches and Percocet tablets (and did not purchase Fentanyl from any other source).

At the end of their work day on March 10, 2006, Lochirco and Knox met Washington at a parking lot in Park Hills, Missouri. Lochirco and Knox pooled their money and purchased two Fentanyl patches (Washington had removed the packaging from the patches) and Percocet tablets. Lochirco and Knox went to Lochirco's residence at 7381 Highway 32 in Ste. Genevieve County, Missouri. Knox orally ingested the Fentanyl patch. Lochirco did not see Knox take any Percocet tablets but was "sure" that Knox did so. (Trial Tr. vol. I, 155.) Knox was "visibly messed up" and fell asleep on the floor. (Id. at 156.) That night Deering talked to Lochirco, and Lochirco told her that he and Knox were "really messed up." (Trial Tr. vol. II, 356.) When it was time to go to work on the morning of March 11, 2006, Lochirco attempted to wake Knox and saw that Knox was not breathing. Lochirco called 911 and attempted to revive Knox but was unable to do so.

Law enforcement, including Detective Sergeant Michael Stacy of the Ste. Genevieve County Sheriff's Department, and emergency medical personnel arrived at Lochirco's residence and found Knox dead. Lochirco told law enforcement officials that Washington was responsible for Knox's death. The autopsy report on Knox's body included the finding that Knox died of a mixed narcotics overdose involving Fentanyl and Oxycodone.

After Knox's death, Deering provided information to the police about her past purchases of Fentanyl patches and Percocet tablets from Washington. Deering agreed

and Lochirco occurring from February 6, 2006, through March 10, 2006. Officer Bradley testified that the pattern and duration of the calls between Washington and Lochirco were consistent with a drug supplier and a drug customer. In addition, Officer Bradley obtained recordings of Washington and two unidentified females discussing the circumstances of this case.

to make a controlled purchase from Washington. On March 16, 2006, law enforcement outfitted Deering's residence with a recording device. Deering placed a call to Washington's cell phone to request the narcotics. Law enforcement also conducted surveillance outside Deering's residence. Officers recorded the meeting between Deering and Washington during which Washington provided her with two Fentanyl patches in exchange for $105 which law enforcement had provided to her to make the purchase. Detective Stacy applied for an arrest warrant for Washington based on the autopsy report and the controlled drug purchase.

On April 19, 2006, Deering assisted law enforcement in locating Washington by placing a monitored call to him and requesting Fentanyl patches. After the call, Trooper Nathan Benson of the Missouri State Highway Patrol observed Washington driving. Trooper Benson stopped Washington, informed him of his Miranda[5] rights, and asked if there was anything illegal in the vehicle. Washington replied that there was not and that he had some patches for a back injury he had sustained. Trooper Benson found multiple Fentanyl patches in the search of Washington's car. Washington was taken to the police station and interviewed by Detective Stacy. Washington asserted that he had the Fentanyl patches because they had been prescribed to him by his doctor for pain.[6]

On December 20, 2007, a federal grand jury returned a four-count indictment against Washington. Count I alleged that on or about March 10, 2006, in St. Francois County, Missouri, Washington distributed Fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a), and that the death of Justin Knox

---

[5]Miranda v. Arizona, 384 U.S. 436 (1966).

[6]Dr. Robert Wudel, Washington's osteopathic physician, testified that he had been Washington's doctor since the summer of 2004 when Washington injured his hip and femur in a fall. Dr. Wudel prescribed Percocet tablets and Fentanyl patches for pain. These prescriptions continued through March 29, 2006.

-4-

resulted from the use of the Fentanyl distributed by Washington in violation of 21 U.S.C. § 841(b)(1)(C). Count II charged that on or about March 10, 2006, Washington distributed Oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a), and that the death of Justin Knox resulted from the use of the Oxycodone distributed by Washington in violation of 21 U.S.C. § 841(b)(1)(C). Count III alleged that on or about March 16, 2006, Washington distributed Fentanyl in violation of 21 U.S.C. § 841(a), and Count IV charged that on or about April 19, 2006, Washington possessed with intent to distribute Fentanyl in violation of 21 U.S.C. § 841(a).

On March 3, 2008, Attorney Ronald Jenkins was appointed to represent Washington.[7] Jenkins filed a Motion to Suppress Recordings of Telephone Conversations on March 14, 2008. Following a hearing on the motion and while it was under consideration, Washington filed a pro se motion alleging that he had received "insufficient assistance of counsel." On May 1, 2008, the magistrate judge[8] held a hearing ex parte to address the motion. There, Washington expressed his frustration that Jenkins was not handling the case in the manner Washington wanted. The magistrate judge recommended that Washington continue to work with Jenkins, noting his experience. Washington stated that he was not asking the court to remove his attorney and did not request to proceed pro se. Jenkins went on to file various pretrial notices and motions on behalf of Washington.

Washington's trial was set to begin on June 16, 2008. On June 4, 2008, Washington filed a pro se request to be heard on June 11, 2008, the same day jury

---

[7]Initially, Assistant Federal Public Defender Janis Good was appointed to represent Washington, but her request to withdraw as counsel, citing her "irretrievably broken" relationship with Washington, was granted at the February 27, 2008, status conference.

[8]The Honorable Terry I. Adelman, United States Magistrate Judge for the Eastern District of Missouri.

selection was to begin. On June 11, 2008, the district court allowed Washington to speak at the pretrial conference. Washington disputed the government's case against him at length. Washington also stated that he did not have sufficient conversations with his attorney and that his attorney was not prepared. However, Washington did not request to proceed pro se. Jenkins conducted voir dire.

On the morning of trial, June 16, 2008, after the jury was selected, Washington announced to the district court that he wanted to proceed pro se. The court advised Washington against doing so, listed the dangers of self-representation, and informed Washington of the procedure that would be followed should he represent himself. The court then granted a recess for Washington to discuss the matter with Jenkins. Following the recess, Washington again stated that he wanted to represent himself. The court determined that Washington had voluntarily waived his right to representation. Jenkins provided Washington with Jenkins's notes with regard to his planned cross-examination of each of the government's witnesses. The court determined that no purpose would be served by Jenkins serving as standby counsel and released him from further representation responsibilities.[9]

Washington represented himself for the remainder of the trial. At the conclusion of the government's evidence, the district court assisted Washington in moving for judgment of acquittal. The court denied the motion. Washington offered no witnesses. Although he sought to recall some of the government's witnesses, the court did not allow him to do so because he proposed no new line of questioning. Washington presented numerous exhibits, some of which the district court admitted. Washington asked for more time in order to prepare his closing statement. The court agreed to close the evidence and give Washington until the next morning to prepare.

---

[9]"A standby counsel's job is to assist the defendant in procedural matters with which he may not be familiar and to facilitate a speedy and efficient trial by avoiding the delays often associated with *pro se* representation." United States v. Campbell, 874 F.2d 838, 849 (1st Cir. 1989).

Washington stated that he was "getting sick" and requested a doctor.  (Trial Tr. vol. III, 559, 561.)  The court granted Washington's request, and Washington was examined by an emergency room doctor at St. Joseph's Health Center in St. Charles, Missouri.

The next morning the trial resumed.  Before the jury was brought in, the court reviewed the medical report as to Washington's condition.  He was diagnosed with anxiety and found "fit for confinement and fit for trial from a medical standpoint."[10] (Trial Tr. vol. IV, 572.)  Washington moved for a mistrial, citing his incompetence with respect to court procedures, lack of time to prepare for trial, his health, and his desire to consult with his past counsel.  The court denied the motion, and the parties made their closing arguments.

The jury found Washington guilty on all four counts.  Prior to Washington's sentencing hearing, he filed numerous pro se motions and objections to the Presentence Investigation Report ("PSR").  At the sentencing hearing on September 12, 2008, Washington complained about his lack of legal assistance and repeatedly requested standby counsel to assist him at the hearing.  The district court postponed the sentencing hearing.  Attorney Daniel Juengel was appointed Washington's standby counsel for sentencing.  The sentencing hearing resumed on November 7, 2008.  The court sentenced Washington to 360 months imprisonment on Counts I and II and 240 months on Counts III and IV, to run concurrently, to be followed by a five-year term of supervised release.  The court also ordered restitution in the amount of $6,768.86 to the decedent's mother for funeral expenses.

---

[10]The report provided:  "This information is about your diagnosis.  Anxiety, parens, nervousness, anxiety is a strong, uneasy feeling.  You like many people have physical symptoms when you get anxious.  Though you are uncomfortable, we did not find any harmful cause for your symptoms today[.]" (Trial Tr. vol. IV, 572.)

II.

Washington asserts that the district court erred by granting his request to represent himself at trial, resulting in the violation of his Sixth Amendment right to counsel.[11]  We review de novo the district court's decision to allow Washington to proceed pro se.  United States v. Keiser, 578 F.3d 897, 902 (8th Cir. 2009).

> The Sixth Amendment provides a criminal defendant the right to counsel and the corresponding right to waive the right to counsel and proceed pro se.  If the defendant waives the right to counsel, the waiver must be voluntary, intelligent, and knowing.  This standard is met if the trial court specifically informed the defendant of the dangers and disadvantages of self-representation, or if the entire record evidences the defendant knew and understood the disadvantages.  An on-the-record colloquy exploring the dangers of self-representation is recognized as the preferred method of substantiating a waiver's validity.

Id. (quotations and citations omitted); see also Faretta v. California, 422 U.S. 806, 807, 835 (1975).  Specifically, Washington contends that the district court erred in granting his request for self-representation because:  (1) his request was involuntary, (2) his request was not clear and unequivocal, (3) his request was untimely and made in order to delay trial, and (4) the court did not make an adequate inquiry into Washington's competence to waive his right to counsel.  We first recite the relevant facts and then address each of Washington's arguments in turn.

---

[11]Washington asserts that the district court's decision also violated his Fifth Amendment due process rights.  "The right to counsel at trial is guaranteed by the Sixth Amendment, but the Fifth Amendment due process clause governs the right to counsel for appellate proceedings."  Steele v. United States, 518 F.3d 986, 988 (8th Cir. 2008).  Because Washington argues that he was improperly allowed to represent himself at *trial*, we do not address his contention that his lack of counsel violated his Fifth Amendment due process rights.

Here, just before the jury was to be brought in for his trial, Washington declared to the district court, "I would like to proceed pro se, Your Honor." (Trial Tr. vol. I, 60.) When the court asked Washington to explain what he meant, he stated, "I would like to represent myself." (Id.) The court asked, "Why on earth would you want to do that at this point in the case?" (Id.) Washington responded that he had "problems" with Jenkins and expressed his frustration at not having seen the Jencks Act material[12] that the government had provided. (Id. at 60-61.) The court asked what not having access to this material had to do with Washington wanting to represent himself, and Washington repeated his complaints about Jenkins. (Id. at 61-62.) The district court cautioned, "Mr. Washington, I think it would be a grave, grave mistake for you to try to represent yourself in this case. This is a serious case. If convicted of Counts I and II, you're facing a mandatory 20-year sentence. You understand that?" (Id. at 62.) Washington responded, "I do understand that." (Id.) The court went on to point out that, if convicted on Counts I and II, Washington faced a maximum sentence of life imprisonment. (Id.) Washington replied, "I understand that." (Id.)

At that point, the court described to Washington, in detail, the procedure that would be followed if Washington represented himself, including, among other things: the possibility that Washington could have to give an opening statement almost immediately, that he would have to follow the Federal Rules of Evidence, the privilege against self-incrimination, that he had no burden to present any evidence because the burden was solely on the government to prove his guilt beyond a reasonable doubt, that he would give a closing argument, and that it would be Washington's job to raise any legal issues as to the jury instructions. (Trial Tr. vol.

---

[12]"The Jencks Act requires the district court, on the motion of a defendant, to produce any 'statements' of a government witness that relate to the subject matter of the witness's testimony, after the witness has testified on direct examination." United States v. New, 491 F.3d 369, 376 (8th Cir. 2007); see 18 U.S.C. § 3500(b), id. § 3500(e)(1). Here, the government provided the Jencks Act material to Jenkins at the pretrial conference on June 11, 2008. (Trial Tr. vol. I, 51.)

I, 63-65.) Specifically, with regard to cross-examination of government witnesses, the court explained:

> [Y]our biggest complaint the other day is you thought Government witnesses were lying. Well, that's not an objection to their testimony. You can cross-examine them and try to show that they are lying, but I can assure you Mr. Jenkins will be able to do that much better than you can because he's done it many, many times before, and if they are lying, he will be able to point out the areas that the jury should consider in assessing their credibility. For a defendant to do that by himself is a very difficult thing.

(Id. at 63-64.) The court concluded, "I just don't see how in the world you can be prepared to do that at this time. Is that what you're asking me to do, not to have Mr. Jenkins on this case for you?" (Id. at 65.) Washington responded by requesting more time to go through the Jencks material, and the court responded,

> You don't get more time. The Government is not obligated to present that material any earlier than they did. In fact, they presented it earlier than they normally are required to present it. Technically under the rules they don't have to present it until after the person testifies because it relates to that person's testimony, so you wouldn't get more time for that. What is it you would do if you have more time?

(Id.) Washington replied, "Hopefully we would prepare, but if not, if I represent myself, and you say go now, and I would start now. I would start right now." (Id. at 66.)

The district court asked Washington and Jenkins to approach the bench for a side bar conversation about the attorney/client issues that Washington had raised. During the side bar, the court and Washington had the following exchange:

-10-

Court:      Well, here is what I want to know from you.  We're going to go forward with this trial, and you can either have Mr. Jenkins represent you, or you can do it on your own.  You have a constitutional right to represent yourself if that's what you want to do.  But, if you decide to represent yourself, you can't ever come back later and say that you thought I shouldn't have let you represent yourself, you'll be making that decision. I think it's a huge mistake.  Your chances are way, way better with Mr. Jenkins than they are representing yourself.

Defendant:  I'm not saying that Mr. Jenkins is not a good lawyer.  I'm telling you about the problems that me and Mr. Jenkins have.  That's what I'm saying. What I really want to do, but I don't think that you would agree to do this, but this is what I would need to feel comfortable with Mr. Jenkins if we would both be allowed to speak.

Court:      No.  It can't be that way.  It will be one or the other.

Defendant:  That's what I thought.

Court:      What are you asking to do?

Defendant:  I'll represent myself.

Court:      I really think you shouldn't do that.

(Id. at 69.)

The court suggested that Washington allow Jenkins to give the opening statement, listen to the government's evidence, and then, revisit the matter at the end of the day.  Although he did not reject the suggestion outright, Washington stated that he did not have "confidence" in Jenkins, and Washington expressed his opinion that Jenkins was not there to defend him.  The court proposed that Jenkins continue to represent Washington with Washington being able to discuss issues with the court during recesses.  Jenkins stated that he did not believe that this approach would be effective.  He went on to state that he had prepared and was ready to try the case but

did not know if he could do so under the circumstances and highlighted the difficulties of representing Washington. When the court asked Washington to decide whether he wanted to continue Jenkins's representation or represent himself, Washington responded with the same previously raised complaints about Jenkins. The court stated,

> I'll hear from you at the end of each trial day, but that's as far as I'm going to go with it. It's your right to represent yourself constitutionally if you want to. Even with what Mr. Jenkins said, even with the problems you both have described, I still think you are far better off having him represent you than representing yourself. But it is your constitutional right, and if that's what you want to do, then I think you're competent, you understand what you're doing, you're not incompetent, and nobody is forcing you to do that, so I'm obliged to allow you to do it if you are demanding that right.

(Id. at 73.) Washington responded, "I do. I do. It's going to take me a moment to get together because it is a scary moment for me." (Id.) The court again cautioned Washington, stating "Once you make this decision, you can't change your mind back[.]" (Id. at 73-74.) Washington responded, "I know." (Id. at 74.) The court announced a short recess for the purpose of allowing Washington to discuss the matter with Jenkins.

Following the recess, the court stated, "Mr. Washington, you told me before that you wished to represent yourself in this case. We have discussed that at some length, and I took a five-minute break to make sure you really want to do this. Are you requesting to represent yourself in this case?" (Id.) Washington responded in the affirmative. The court then addressed each of the charges against Washington and the statutory minimum and maximum sentences for each charge. The court asked Washington, "So, you understand what you're charged with [and] the potential punishments you are facing?" (Id. at 75.) Washington responded in the affirmative. The court then asked, "But you're telling me that you do wish to represent yourself, correct?" (Id.) Washington again responded in the affirmative. The court determined,

I find that . . . is an unequivocal assertion of your constitutional right to represent yourself. I find that you are competent to make that determination, you understand your rights, and you know what you're doing. No one is forcing you to do this. It is a voluntary waiver. I have advised you that I think it's the wrong thing to do, but . . . you have the right to do it, and so that's how we will proceed.

(Id. at 75-76.)

The court then asked Jenkins to provide all of his trial preparation materials to Washington, and Jenkins did so, including a folder on each witness containing prepared cross-examination. Although Washington stated that he would accept assistance from Jenkins, the court declined to require Jenkins to serve as standby counsel, explaining:

I have considered whether to require you to stand by as standby counsel, but under the circumstances, I think that nothing would be served by it. Mr. Washington has indicated very clearly that he wants to [represent himself], and I do not expect he would accept your help beyond giving him the written materials, and you giving him those folders is sufficient.

(Id. at 76-77.)

A.

Washington first asserts that he did not voluntarily waive his right to counsel because the district court forced him to proceed pro se or with an attorney that Washington perceived to be unprepared and unable to provide adequate representation. "Where a defendant moves for replacement counsel and is told that he must choose between his current counsel and proceeding pro se, his waiver may not be voluntary, depending on the circumstances." United States v. Patterson, 140 F.3d 767, 776 (8th Cir. 1998). However, "[w]hile the 'Hobson's choice' between

-13-

proceeding to trial with an unprepared counsel or no counsel at all may violate the right to counsel, there is no constitutional difficulty where the defendant is provided the real alternative of choosing between adequate representation and self-representation." United States v. Ladoucer, 573 F.3d 628, 634 (8th Cir. 2009) (quotation omitted).[13] In this case, the record does not suggest that Jenkins was unprepared or inadequate as counsel. Rather, Jenkins, whose trial preparation materials included his planned cross-examination of the government's witnesses, stated, "I have prepared, I have worked so hard, I am ready to try this case[.]" (Trial Tr. vol. I, 71.)

Moreover, the district court allowed Washington to explain his dissatisfaction with Jenkins, considered Washington's grievances, and properly found Washington's complaints unjustified. See United States v. Mentzos, 462 F.3d 830, 839 (8th Cir. 2006) (noting that "the defendant bears the burden of showing justifiable dissatisfaction with appointed counsel to be granted a substitute"). Thus, "the district court did not offer [Washington] a Hobson's choice, and [Washington's] decision to proceed pro se was not rendered involuntary simply because the court required him to choose between qualified counsel and self-representation." Ladoucer, 573 F.3d at 634 (quotation omitted). In addition, while Washington stated that he would retain Jenkins if both were allowed to speak, "[t]he district court may properly require the defendant to choose either to proceed pro se, with or without the help of standby counsel, or to utilize the full assistance of counsel." Keiser, 578 F.3d at 903 (quotation omitted); see McKaskle v. Wiggins, 465 U.S. 168, 183 (1984) (providing that there is no requirement that "a trial judge permit 'hybrid' representation").

---

[13]"The phrase 'Hobson's choice' comes from Thomas Hobson, an English liveryman who required every customer to choose the horse nearest the door. A Hobson's choice is an apparently free choice with no real alternative." Cano-Merida v. I.N.S., 311 F.3d 960, 964 n.3 (9th Cir. 2002) (quotation omitted).

Next, Washington argues that he did not clearly and unequivocally waive his right to counsel because he stated that he would welcome Jenkins's assistance. "A defendant who wishes to waive his right to counsel, and thereby to proceed pro se, must do so clearly and unequivocally." United States v. Light, 406 F.3d 995, 998-99 (8th Cir. 2005) (quotation omitted). Here, the jury had already been selected, and Washington's trial was to begin on June 16, 2008. At the beginning of the proceedings on June 16th, Washington declared to the district court, "I would like to proceed pro se, Your Honor." (Trial Tr. vol. I, 60.) This statement was not, in any way, ambiguous. The court asked for clarification, and Washington responded, "I would like to represent myself." (Id.) Following Washington's initial invocation of his right to proceed pro se, the district court informed him of the dangers and disadvantages of self-representation as well as the serious nature of the charges against him, including the potential penalties. In the face of all this information, Washington again stated, "I'll represent myself." (Id. at 69.) The district court then declared a recess so Washington could discuss the matter with Jenkins. Following the recess, the district court asked Washington, "Are you requesting to represent yourself in this case?" (Id. at 74.) Washington responded, "Yes." (Id.) After again advising Washington of the charges and range of punishment and inquiring whether he wanted to represented himself, Washington acknowledged that he understood both and responded that he wanted to represent himself. (Id. at 75.) After reviewing the record, we conclude that Washington's repeated invocation of his right to self-representation was clear and unequivocal. Our determination is not altered by the fact that Washington stated that he would welcome Jenkins's assistance, a statement belied by Washington's unfounded criticism of Jenkins's handling of the case.[14]

---

[14]Again, we note that there is no requirement that a district court appoint standby counsel. See McKaskle v. Wiggins, 465 U.S. 168, 183 (1984); United States v. Keiser, 578 F.3d 897, 903 (8th Cir. 2009).

C.

Washington also asserts that the district court erred in granting his request to proceed pro se because it was (1) untimely and (2) made to disrupt the court proceedings and obtain a continuance. Washington relies on United States v. Edelmann, 458 F.3d 791 (8th Cir. 2006). There, this court upheld the district court's denial of the defendant's request to represent herself because (1) she "failed to make her request to proceed pro se in a timely manner" and (2) the district court "belie[ved] that [the defendant] was trying to disrupt or delay the start of trial . . . ." Id. at 809. However, in no way does Edelmann provide that a trial court *must* deny a request for self-representation in such a circumstance, and this court expressly premised its holding on "the special facts" present in that case. Id. Washington cites several other cases from other circuits upholding the denials of defendants' requests to proceed pro se as: (1) untimely[15] or (2) having an improper purpose.[16] While these cases demonstrate a district court's discretion to deny a request for self-representation on either ground, none require that a court do so. See supra notes 14-15. Thus, despite Washington's admission that his self-representation request was both untimely and for an improper purpose, neither concession serves as a basis for reversing the district court's decision to grant his request.

_____

[15]See United States v. Majors, 328 F.3d 791, 794 (5th Cir. 2003) (per curiam) (request made on second day of trial); United States v. Smith, 413 F.3d 1253, 1281 (10th Cir. 2005) (request made six days before trial); United States v. Young, 287 F.3d 1352, 1354 (11th Cir. 2002) (request made after the jury was empaneled). Robards v. Rees, 789 F.2d 379, 383-84 (6th Cir. 1986) (request made on first day of trial after the clerk had called the roll of the jurors).

[16]See United States v. Bush, 404 F.3d 263, 272 (4th Cir. 2005) (request was "an effort to manipulate and distort the trial process"); United States v. Kaczynski, 239 F.3d 1108, 1118 (9th Cir. 2001) (request "was for tactical reasons and not for any good faith reason . . . [but for] delay"); United States v. Frazier-El, 204 F.3d 553, 560 (4th Cir. 2000) (request was "more a manipulation of the system than an unequivocal desire to invoke [defendant's] right of self-representation").

D.

Finally, Washington claims that the district court improperly found him competent to waive his right to counsel because the court did not hold a hearing or conduct any inquiry into his competency. "Before allowing a defendant to waive his right to counsel, a court must be satisfied that the defendant is competent to do so." United States v. Crawford, 487 F.3d 1101, 1105 (8th Cir. 2007) (citing Godinez v. Moran, 509 U.S. 389, 400 (1993)).

> Generally, a court need not sua sponte order an evaluation to determine a defendant's competence to waive counsel; "[a]s in any criminal case, a competency determination is necessary only when a court has reason to doubt the defendant's competence." Unless "evidence raises sufficient doubt" about a defendant's competence, further inquiry is not required.

Id. (quoting Godinez, 509 U.S. at 401 n.13); see 18 U.S.C. § 4241(a)-(b) (stating that a court "shall order" a competency hearing upon its own motion if "there is reasonable cause to believe" a defendant is not competent and that a court "may order" a psychological evaluation prior to such a hearing). Therefore, "[w]hether a competency evaluation is warranted is a determination within the discretion of the district court." Crawford, 487 F.3d at 1105.

In Crawford, the defendant argued that the district court erred by not ordering an evaluation to determine whether he was competent to waive his right to counsel and should have exercised its authority to order a competency evaluation, even without a request from the government or the defense. Id.; see 18 U.S.C. § 4241(a)-(b). We determined that the district court did not abuse its discretion by not ordering a competency evaluation because: (1) Crawford's trial counsel did not request a competency evaluation prior to the court's consideration of Crawford's motion to proceed pro se; (2) "[t]he district court . . . had the opportunity to observe [Crawford] directly[] and did not find a competency evaluation necessary"; and (3) "[t]he district

-17-

court specifically concluded Crawford was competent, noting that Crawford's multiple filings in the district court indicated that he was 'literate, competent, and understanding.'" 487 F.3d at 1105; see United States v. Vamos, 797 F.2d 1146, 1150 (2d Cir. 1986) (noting that "deference is owed to the district court's determinations based on observation of the defendant during the proceedings").

Moreover, the Supreme Court's decision in Indiana v. Edwards, 128 S. Ct. 2379 (2008), has not altered this court's approach. Rather, Edwards affirms it. There, the Supreme Court recognized "a mental-illness-related limitation on the scope of the self-representation right" and clarified that the standard for mental competence to represent one's self is higher than the standard of mental fitness to stand trial. See id. at 2384-88. With regard to a measure for mental capacity to represent one's self at trial, the Court "concluded that the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so" but declined "to adopt . . . a more specific standard." Id. at 2387-88. However, the Court did recognize that "the trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." Id. at 2387. Therefore, while a defendant must be competent in order to proceed pro se, Edwards does not require that a trial judge: (1) conduct an inquiry into the competency of every defendant who requests to proceed pro se, or (2) hold a hearing prior to making a competency determination.

In this case, we find no abuse of discretion in the district court not ordering a competency evaluation or holding a competency hearing. First, none of the parties, including Washington or either of the attorneys that represented him prior to his request to proceed pro se, sought any sort of inquiry into Washington's competency. Second, the district court had the opportunity to observe Washington and interact with him at length. Finally, the district court specifically concluded that Washington was competent to waive his right to counsel. (Trial Tr. vol. I, 73.)

-18-

In addition, Washington did not show, and has not shown, that he suffered from any sort of mental illness or incapacity. Washington contends that his incompetency to represent himself was apparent because "it is clear that [he] was not in a position to fully appreciate what he was doing in waiving his right to counsel and acting *pro se*" because he: (1) "continually had to have the protocol explained to him as far as the role of his lawyer[,]" (2) "brought up motions and arguments to the judge about [the] facts of the case despite several explanations by the court that it was not proper[,]" (3) "wanted a continuance and wanted to be able to act as co-counsel in his case[,]" and (4) displayed "[a] boisterous attitude[,] and perpetual, improper filing of *pro se* motions . . . ." (Appellant's Br. at 49.) However, "a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation . . . ." Faretta, 422 U.S. at 835; see Ladoucer, 573 F.3d at 634 ("[A] criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation." (quoting Godinez v. Moran, 509 U.S. 389, 400 (1993))). Thus, Washington's lack of understanding of court procedures, in and of itself, does not suggest his incompetence to proceed pro se.

In sum, we conclude that this record is sufficient to establish that Washington's waiver of his right to counsel at trial was knowing, voluntary, and intelligent. The record reflects that the district court advised Washington of the charges and the serious penalties that he faced, and Washington indicated that he understood them. The court outlined trial procedures that Washington would have to follow if he proceeded pro se, repeatedly warned Washington about the dangers of self-representation, and recommended that Washington continue with his counsel numerous times. See United States v. Kiderlen, 569 F.3d 358, 366 (8th Cir.), cert. denied, 130 S. Ct. 564 (2009) ("Consistent with *Faretta*, where the trial judge warned the defendant that he thought self-representation was a mistake and explained that the defendant would have to follow the rules of procedure, we have deemed warnings

comparable to those administered here sufficient to establish a valid waiver."). Accordingly, we conclude that the district court did not violate Washington's Sixth Amendment right to counsel by permitting him to proceed pro se at trial.

III.

Washington next argues that there is insufficient evidence to support his convictions on Counts I and II. Washington asserts that the government presented evidence that he distributed Fentanyl patches and Percocet tablets to a person that ultimately distributed those drugs to the victim, Justin Knox. However, Washington contends that the evidence presented at trial was not that Knox was killed by ingesting Fentanyl patches or Percocet tablets, individually, but that his death resulted from a mixed narcotic overdose such that the evidence does not support the guilty verdicts on either Counts I or II. Washington further argues that there is insufficient evidence to sustain the jury's guilty verdict on Count II because the evidence presented at trial showed that acetaminophen, one of the key ingredients in Percocet tablets, was not found in Knox's system.

"We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government, resolving evidentiary conflicts in the government's favor, and drawing all reasonable inferences in favor of the jury's verdict." United States v. Stymiest, 581 F.3d 759, 764 (8th Cir. 2009).

> We will uphold a jury verdict if substantial evidence supports it. Substantial evidence exists if a reasonable minded jury could have found the defendant guilty beyond a reasonable doubt. This standard of review is a strict one; we will not lightly overturn the jury's verdict. Reversal is appropriate only where a reasonable jury could not have found all the elements of the offense beyond a reasonable doubt.

-20-

United States v. Cruz, 285 F.3d 692, 697 (8th Cir. 2002) (citations and quotation omitted). To resolve the sufficiency challenge, we must examine the government's evidence as to the cause of Knox's death.

Dr. Christopher Long directs the forensic toxicology laboratory at the St. Louis University School of Medicine Department of Pathology. (Trial Tr. vol. II, 219.) He is also the chief toxicologist for St. Louis County. (Id.) Dr. Long analyzed blood and urine samples from the decedent's body and issued a toxicology report. (See id. at 221.) Dr. Long testified that the toxicology report for the decedent was positive for Diazepam (Valium), Nordiazepam (the metabolite[17] of Diazepam), Fentanyl, Oxycodone, and Oxymorphone (the metabolite of Oxycodone). (Id. at 224-26, 229.) Dr. Long stated that the Diazepam was present at a generally therapeutic level and did not cause Knox's death. (Id. at 224-25.) Similarly, Dr. Long stated that the Nordiazepam was not at a lethal level. (Id. at 225.)

Dr. Long explained that .2 micrograms[18] per milliliter or greater of Oxycodone in the bloodstream is generally considered to be fatal. (Id. at 226.) Oxycodone was present in the decedent's blood at a level of .05 micrograms per milliliter, which Dr. Long stated is a low level. (Id.) However, Oxycodone was present in the decedent's urine at a level greater than two micrograms per milliliter. (Id. at 228.) Dr. Long observed that this "shows that he had a significant concentration of Oxycodone in [his] blood" at one time and means that Oxycodone "could have been" present in his system in "a fatal amount." (Id. at 228-29.)

---

[17]A metabolite is "any substance produced by metabolism or by a metabolic process." Dorland's Illustrated Medical Dictionary 1160 (31st ed. 2007).

[18]"[A] microgram is one millionth of a gram[.]" Cooper v. Brown, 510 F.3d 870, 933 n.12 (9th Cir. 2007).

Dr. Long stated that the average lethal level of Fentanyl in the bloodstream is eight nanograms[19] per milliliter. (Id. at 226.) Fentanyl was present in the decedent's blood at 5.3 nanograms per milliliter, and, although this is lower than the average lethal level, Dr. Long stated that 5.3 nanograms "is consistent with concentrations that have produced a lethal result." (Id. at 225-26.) Fentanyl was present in the decedent's urine at a level greater than 200 nanograms per milliliter,[20] which Dr. Long explained "supports the blood as having [contained] a fatal level."[21] (Id. at 227-28.)

In terms of the cause of Knox's death, Dr. Long stated, "Generally speaking, you'd be looking at poli-pharmacy, because you have the three drugs; the Oxycodone, you have some Diazepam, and of course you have Fentanyl. Fentanyl is the big dog in the bunch. That is the one that could have been fatal of and by itself without needing anything else. The other drugs did aid and assist." (Id. at 229.)

Dr. Michael Zaricor is a pathologist at Mineral Area Regional Medical Center in Farmington, Missouri. (Trial Tr. vol. II, 192.) For the past 28 years, Dr. Zaricor has performed "autopsies for several counties in southeast Missouri to determine cause and manner of death." (Id.) Dr. Zaricor performed an autopsy on Knox's body and issued a report as to the manner and cause of his death. (Id. at 194-95.) In addition to the findings that he made from his examination of the decedent's body, Dr. Zaricor reviewed Dr. Long's toxicology report in order to determine the manner and cause of death. (Id. at 196-97.) Dr. Zaricor determined that "[t]he cause of [Knox's]

---

[19]"A nanogram is one billionth of a gram[.]" Id.

[20]Dr. Long explained that 200 nanograms per milliliter is the highest concentration that can be revealed by testing such that "once you exceed 200 nanograms per milliliter, it's an exercise in academics." (Trial Tr. vol. II, 227.)

[21]Dr. Long explained that the level of Fentanyl in the decedent's urine "shows that the body is trying to eliminate this toxin, and because of the concentration, it is consistent with the blood producing a fatality." (Id. at 227-28.)

death was a mixed narcotic overdose of Fentanyl and Oxycodone."[22] (Id. at 199.) Dr. Zaricor explained that death caused by an overdose of Fentanyl and Oxycodone usually results from respiratory arrest, although "[i]t can also cause cardiac arrest, coma, [and] seizures[.]" (Id.) Dr. Zaricor further testified that "[a]t the time of death, I'm sure either the Fentanyl or the Oxycodone was in lethal levels [in Knox's blood][,]" (id. 214-15), and that, independently of one another, each drug was present in the decedent's system in significant enough levels to kill him, (id. at 199-200).

A.

Count I requires that the government prove that Washington: (1) intentionally distributed Fentanyl to another person, (2) knew that Fentanyl was a controlled substance at the time of the distribution, and (3) the death of Justin Knox resulted from the use of the Fentanyl distributed by Washington. See 21 U.S.C. § 841(a), (b)(1)(C). Washington only contests the sufficiency of the evidence as to the third element. Dr. Long testified that the level of Fentanyl present in the decedent's urine indicated that his blood had contained a "fatal level" of Fentanyl. (Trial Tr. vol. II, 227-28.) Dr. Zaricor testified that Fentanyl was present in the decedent's system in a significant enough amount to cause his death, even without the presence of Oxycodone. (Id. at 199-200.) In light of the standard of review, see Stymiest, 581 F.3d at 764, this testimony requires us to sustain Washington's conviction on Count I.

B.

Count II requires that the government prove: (1) Washington intentionally distributed Oxycodone to another person, (2) at the time of the distribution,

_____

[22]Dr. Zaricor testified that Diazepam and its metabolite, Nordiazepam, were also present in the decedent's system but that Diazepam did not contribute to Knox's death because it: (1) is a sedative, non-lethal type of drug and (2) was only present at high therapeutic levels. (Id. at 199.)

Washington knew that it was a controlled substance, and (3) the death of Justin Knox resulted from the use of the Oxycodone distributed by Washington. See 21 U.S.C. § 841(a), (b)(1)(C). Again, Washington challenges only the third element. Dr. Zaricor testified that, at one time, Knox's system contained a significant enough amount of Oxycodone to cause his death, absent the Fentanyl. (Trial Tr. vol. II, at 199-200.) Bound by the standard of review, see Stymiest, 581 F.3d at 764, we must affirm Washington's conviction on Count II based on this testimony.

## C.

Washington also contends that Count II is not supported by sufficient evidence because: (1) Count II is premised on the fact that Washington distributed Percocet tablets that were ultimately distributed to Knox and (2) one of the key ingredients in Percocet, acetaminophen, was not found in the decedent's system. However, both Dr. Long and Dr. Zaricor testified that, even though the decedent's urine was not tested for acetaminophen, it is still possible that he ingested Percocet tablets in light of the fact that acetaminophen is metabolized about twice as fast as Oxycodone. (Trial Tr. vol. II, 230.) Dr. Zaricor further testified that, because there was only a small amount of Oxycodone present in the decedent's blood, "it . . . ma[d]e sense that the acetaminophen . . . ha[d] already metabolized and would not show up." (Id. at 217.) In view of the standard of review, see Stymiest, 581 F.3d at 764, this testimony is certainly sufficient to demonstrate that Knox ingested the Oxycodone that resulted in his death via the Percocet tablets that Washington had distributed.

## D.

Finally, Washington argues that his convictions on Counts I and II must be reversed because "[b]oth of the . . . counts were for the death of the same individual." (Appellant's Br. 53.) Section 841(b)(1)(C) is an enhanced penalty provision, imposing a mandatory minimum of 20 years imprisonment if the defendant distributes

-24-

a specified controlled substance and "death or serious bodily injury results from the use of" the substance. 21 U.S.C. § 841(b)(1)(C). "From the statute's language, it is clear that Congress intended to expose a defendant to a more severe minimum sentence *whenever* death or serious injury is a consequence of the victim's use of a controlled substance that has been . . . distributed by the defendant." United States v. Monnier, 412 F.3d 859, 861 (8th Cir. 2005) (quoting United States v. McIntosh, 236 F.3d 968, 972 (8th Cir. 2001)). We have already determined that the evidence was sufficient for the jury to conclude that Washington distributed Fentanyl that, in and of itself, resulted in the death of Justin Knox. Similarly, we have concluded that sufficient evidence supports the jury's verdict that Washington distributed Oxycodone that resulted in Knox's death. Thus, Washington was convicted of two distributions that resulted in death. We cannot see any reason why the fact that the distributions at issue resulted in the same death means that Washington cannot be convicted for each distribution, and, as in McIntosh, "decline to hinder Congress's will, apparent from the face of the statute, through a judicial pronouncement that the statute requires more than it says." 236 F.3d at 972.

IV.

Washington also argues that the district court admitted testimony from Lochirco, Deering, and Cole that Washington distributed Fentanyl patches and Percocet tablets to them between November 2005 and March 2006 in violation of Federal Rule of Evidence 404(b)[23] in that (1) the evidence only showed Washington's propensity to sell drugs, (2) the evidence is highly prejudicial and of no probative value to the crimes charged, and (3) the government failed to provide the requisite

---

[23]"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b).

pretrial notice of its intent to offer such evidence.[24] Although a district court's admission of evidence under Rule 404(b) is normally reviewed for an abuse of discretion,[25] Washington failed to object to any of the testimony about which he now complains such that we review the admission of the evidence for plain error. United States v. Roundtree, 534 F.3d 876, 878 (8th Cir. 2008). "Plain-error review permits reversal only if the error was so prejudicial as to have affected substantial rights resulting in a miscarriage of justice." United States v. Weaver, 554 F.3d 718, 722 (8th Cir.), cert. denied, 130 S. Ct. 140 (2009) (quotation omitted).

The district court did not violate Rule 404(b), plainly or otherwise, by admitting this evidence because it does not fall within the confines of the rule.

> Rule 404(b), which governs the admission into evidence of wrongful conduct other than the conduct at issue, applies only to *extrinsic* and not to *intrinsic* evidence. Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred. Such evidence is admitted because the other crime evidence completes the story or provides a total picture of the charged crime.

---

[24]"In criminal cases, Rule 404(b) requires the prosecution to give pretrial notice, unless the district court excuses the notice at trial, regarding the 'general nature' of any Rule 404(b) evidence the government 'intends to introduce at trial.'" United States v. Clarke, 564 F.3d 949, 957 (8th Cir.), cert. denied, 130 S. Ct. 651 (2009) (quoting Fed. R. Evid. 404(b)).

[25]Washington argues that the abuse-of-discretion standard applies because Jenkins filed a "Notice with the Court regarding 404(b)" prior to trial which was adequate to preserve the issue. However, as the government asserts, the notice filed by Jenkins does not constitute an objection to the evidence at trial. On June 9, 2008, Jenkins filed a "Notice of No Rule 404(b) Evidence," in which he stated that he "ha[d] conferred with counsel for the government and both counsel believe there is no Rule 404(b) evidence to be adduced in the government's case in chief."

United States v. Johnson, 463 F.3d 803, 808 (8th Cir. 2006) (quotations and citations omitted); see United States v. Clarke, 564 F.3d 949, 957 (8th Cir.), cert. denied, 130 S. Ct. 651 (2009) ("We have consistently held crimes or acts which are inextricably intertwined with the charged crime are not extrinsic and Rule 404(b) does not apply." (quotation omitted)).

Lochirco, Deering, and Cole's testimony as to their drug dealings with Washington "provid[ed] the context in which the charged crime[s] occurred," and was, thus, admissible in order to "complete[] the story or provide[] a total picture of the charged crime[s]." Johnson, 463 F.3d at 808 (quotation omitted). Lochirco's testimony establishes how Washington became Knox's drug dealer, and Washington was charged with distributing drugs to Knox that resulted in his death (Counts I and II). Counts III (distribution of Fentanyl on March 16, 2006) and IV (distribution of Fentanyl on April 19, 2006) actually involve Deering. Thus, Deering's testimony that, prior to those dates, Washington had also distributed Fentanyl to her was intrinsic to both Counts III and IV.

Furthermore, we note that prior drug transactions testified to were close in time (between November 2005 and March 2006) to the charged distributions which occurred in March and April 2006. See United States v. Ragland, 555 F.3d 706, 708, 714 (8th Cir. 2009) (providing that, where the defendant was charged with distribution of heroin resulting in death, testimony linking the defendant to heroin distribution during the year leading up to the death was "not too remote in time to be relevant"). Because the testimony that Washington complains of, for the first time on appeal, is intrinsic evidence, not extrinsic evidence covered by Rule 404(b), the district court's

admission of such evidence did not violate the rule.[26] As Rule 404(b) is inapplicable, we need not address Washington's inadequate notice argument.

V.

Washington's final argument is that the district court erred in submitting jury instructions 17 and 18 because they are logically inconsistent. "[B]ecause [Washington] did not object to the jury instructions at trial, we review the jury instructions only for plain error. Plain-error review permits reversal only if the error was so prejudicial as to have affected substantial rights resulting in a miscarriage of justice." Weaver, 554 F.3d at 722 (quotation omitted).

The instructions at issue read as follows:

Instruction No. 17

The Government need not prove that the defendant knew his distribution of Fentanyl could result in the death of another. The Government need not prove the defendant intended to cause death, knowingly risked death or that death was reasonably foreseeable. Additionally, the Government need not prove that the defendant distributed the Fentanyl to Justin Knox.

All the Government must prove beyond a reasonable doubt is that the defendant intentionally distributed the Fentanyl and that but for

---

[26]Washington also asserts that Cole's testimony as to the effect that drugs had on her life and the nature of her relationship with Washington violated Rule 404(b). We conclude that Rule 404(b) does not cover Cole's testimony on these subjects. See United States v. Clarke, 564 F.3d 949, 957 (8th Cir. 2009) ("Federal Rule of Evidence 404(b) excludes evidence of 'crimes, wrongs, or acts' which are offered to show a defendant's propensity, or character, to commit a crime[.]" (quoting Fed. R. Evid. 404(b)).

-28-

Justin Knox's use of the Fentanyl that defendant distributed, Justin Knox would not have died.

Instruction No. 18

The Government need not prove that the defendant knew his distribution of Oxycodone could result in the death of another. The Government need not prove the defendant intended to cause death, knowingly risked death or that death was reasonably foreseeable. Additionally, the Government need not prove that the defendant distributed Oxycodone to Justin Knox.

All that the Government must prove beyond a reasonable doubt is that the defendant intentionally distributed Oxycodone and that but for Justin Knox's use of the Oxycodone that defendant distributed, Justin Knox would not have died.

Washington argues that these instructions are logically inconsistent because they present mutually exclusive causes of death: one states that the death resulted from the distribution of Fentanyl, and the other states that the death resulted from the distribution of Oxycodone. Washington asserts that he was prejudiced by Jury Instructions 17 and 18 because they allowed the jury to render legally inconsistent verdicts. However, based on the charges, there was no other way for the district court to instruct the jury. Count I charged that Washington distributed Fentanyl and that the death of Knox resulted from this distribution. Count II charged Washington with the distribution of Oxycodone that resulted in the death of Knox. Instructions 17 and 18 only reflect the charges in the case. Therefore, the district court did not plainly err in instructing the jury.

VI.

For the foregoing reasons, we affirm the district court's judgment in all respects.

_____

-29-